UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, AND ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,<br><br>               Plaintiffs,<br><br>vs.<br><br>GABRIEL DASSA, D.O.,<br>SUKDEB DATTA, M.D.,<br>DARRIN KALOZ, D.C.,<br>YELENA SHUBINA, M.D. (a.k.a. "YELENA BOGORAZ"),<br>DANIEL SCHLUSSELBERG, M.D.,<br>DASSA ORTHOPEDIC MEDICAL SERVICES, P.C. d/b/a C\V ORTHOPEDIC,<br>GARDEN STATE NEURO STIMULATION, LLC,<br>DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER, LLC,<br>ADJUST FOR LIFE CHIROPRACTIC, P.C.,<br>NEWBURGH PRIMARY CARE, P.C. d/b/a ELITE ORTHOPEDICS,<br>LEADING EDGE MEDICAL DIAGNOSTIC, P.C.,<br>ARTHUR KOSTANIAN,<br>SERGEY DENEVICH,<br>GENNADI KHODAK (a.k.a. "GENE KHODAK"),<br>SKAZKA, LLC, and<br>NIMBLE BUSINESS SOLUTIONS, INC.,<br><br>               Defendants. | Civil Action No.: 23-cv-07515 |

## PLAINTIFFS' COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.    <u>INTRODUCTION</u>

1.    This case is about laypersons and healthcare providers who banded together to access and then exploit the generous benefits available to automobile accident victims under New York's "No-Fault" insurance laws.

2.    The defendants' scheme was designed to achieve several goals, including (a) allowing laypersons to participate in the ownership, operation, and control of a series of multi-disciplinary healthcare facilities, (b) allowing a layperson to participate in the ownership, operation, and control of a diagnostic imaging center; (c) providing—and then collecting payment for—a substantial volume of medically unnecessary healthcare and diagnostic imaging services, and (d) channeling to the laypersons the professional fees and profits generated through the operation of these facilities.

3.    As detailed herein, Defendants Arthur Kostanian ("Kostanian") and Sergey Denevich ("Denevich") owned and operated Skazka, LLC ("Skazka").

4.    At all times relevant, Defendant Gennadi "Gene" Khodak ("Khodak") owned and operated Nimble Business Solutions, Inc. ("Nimble Business Solutions").

5.    Kostanian and Denevich, through Skazka, and Khodak, through Nimble Business Solutions, operated and controlled the so-called "multidisciplinary" clinics located at 253 Route 211 East, Middletown, New York (the "Route 211 Clinic"), 244-250 Broadway, Newburgh, New York (the "Broadway Clinic"), 1 Civic Center Plaza, Suite 107, Poughkeepsie, New York (hereinafter, the "Civic Center Clinic"), 3657 Albany Post Road, Poughkeepsie, New York (hereinafter, the "Albany Post Road Clinic"), and 17 Perlman Drive, Spring Valley, New York (hereinafter, the "Perlman Drive Clinic").

6.      Khodak, as the purported "Office Manager", further participated in the unlawful operation and control of a diagnostic imaging center located at 290 Broadway, Newburgh, New York.

7.      Kostanian, Denevich, and Khodak, as laypersons, are prohibited by New York law from (a) providing professional healthcare services, (b) holding any ownership or controlling interests in any entity organized to provide professional healthcare services, or (c) sharing in the fees or profits generated through the delivery of professional healthcare services.

8.      At all relevant times, Kostanian and Denevich used Skazka to control the multidisciplinary clinics and profit from the services provided to patients at each location.

9.      At all relevant times, Khodak used Nimble Business Solutions to control the multidisciplinary clinics and to further control the diagnostic imaging center in order to profit from the services provided to patients at each location.

10.      As set out below, Kostanian and Denevich, through Skazka, and/or Khodak, through Nimble Business Solutions, purposely and knowingly conspired with Defendants Gabriel Dassa, D.O. ("Dassa"), Sukdeb Datta, M.D. ("Datta"), Darin Kaloz, D.C. ("Kaloz"), Yelena Shubina, M.D. ("Shubina") (a.k.a. "Yelena Bogoraz"), and Daniel Schlusselberg, M.D. ("Schlusselberg") (collectively, the "Healthcare Provider Defendants") to carry out this scheme.

11.      The Healthcare Provider Defendants provided services to patients of the multidisciplinary clinics and the diagnostic imaging center through the following entities: Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic ("Dassa Orthopedic Medical Services"), Garden State Neuro Stimulation, LLC ("Garden State Neuro Stimulation"), Datta Endoscopic Back Surgery & Pain Center, LLC ("Datta Endoscopic Back Surgery & Pain Center"), Adjust For Life Chiropractic, P.C. ("Adjust For Life Chiropractic"), Newburgh Primary Care, P.C. d/b/a Elite

Orthopedics ("Newburgh Primary Care"), and Leading Edge Medical Diagnostic, P.C. ("Leading Edge Medical Diagnostic") (collectively, the "PC Defendants").

12.     The PC Defendants were registered in the names of the Healthcare Provider Defendants, but the entities were always under the control of Kostanian, Denevich, Khodak, and their associates.

13.     Upon information and belief, Kostanian and Denevich used agreements between themselves and the PC Defendants, which were designed to adhere the PC Defendants to Kostanian and Denevich, in return for "management", "marketing", "administrative", and "consulting" services.

14.     The agreements were also structured to ensure that the PC Defendants' professional fees and profits were channeled to Kostanian and Denevich through Skazka.

15.     Similarly, Khodak exerted control in several ways, including by using agreements between Nimble Business solutions and the PC Defendants, which were designed to adhere the PC defendants to Khodak in return for "billing", "collection", "coding", and/or "verification" services.

16.     As set out below, Khodak further participated in this scheme by controlling the operation and management of Leading Edge Medical Diagnostic.

17.     Overall, the PC Defendants were vital to this scheme because the entities could be used to deliver healthcare and diagnostic imaging services to patients, which could then be billed to insurers like Allstate.

18.     The State of New York was the perfect venue for the Defendants' fraud scheme because New York's No-Fault laws provides medical coverage totaling $50,000.00 for each person involved in a motor vehicle accident regardless of fault.

19.     For this scheme to pay-off, Kostanian, Denevich, and Khodak needed the PC Defendants to generate as much revenue as possible.

20.     As set out below, this goal was achieved by delivering medically unnecessary services to patients of the multidisciplinary clinics, and then causing the PC Defendants to seek and collect payment for those services.

21.     Another aspect of this scheme involved the referral of the multidisciplinary clinics' patients to other provider(s) controlled by Kostanian, Denevich, Skazka, and/or Khodak.

22.     For example, numerous patients of the multidisciplinary clinics were steered to Leading Edge Medical Diagnostic for diagnostic imaging studies.

23.     The services provided by Leading Edge Medical Diagnostic were not compensable because the diagnostic imaging studies purportedly performed upon the patients were not medically necessary and were provided for the purpose of creating false reasons to continue providing care through the PC Defendants.

24.     The services provided and billed for by Leading Edge Medical Diagnostic were also not compensable under New York's No-Fault laws because Leading Edge Medical Diagnostic was unlawfully owned and controlled by one or more layperson (i.e., Khodak).

25.     Additionally, the regular referrals of the multidisciplinary clinics' patients to Leading Edge Medical Diagnostic were unlawful to the extent that Kostanian, Denevich, Skazka, Khodak, and/or Nimble Business Solutions maintained controlling or ownership interests over Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, and Datta Endoscopic Back Surgery and Pain Center (i.e., the sources of the referral for diagnostic imaging studies), while Khodak maintained controlling or ownership interest over Leading Edge Medical Diagnostic (the provider of the diagnostic imaging services).

26.    At all relevant times, the defendants have purposely induced Allstate to make No-Fault benefit payments to the PC Defendants in connection with healthcare and diagnostic imaging services that were purportedly provided to patients of the PC Defendants, even though the defendants knew that the charges for these healthcare and diagnostic imaging services were not compensable under New York law.

27.    At all relevant times, each defendant knowingly and purposely conspired with one or more of their co-defendants to accomplish or further the unlawful objectives of this scheme.

28.    The success of the defendants' scheme to defraud depended upon the regular use of the U.S. Mail.

29.    As set out below, the defendants conducted the affairs of the PC Defendant enterprises by, among other things, using the U.S. Mail to transmit to Allstate the PC Defendants' treatment records, invoices, bills, and other insurance claim documents, all of which contained material misrepresentations concerning (a) the medical necessity of the healthcare and diagnostic imaging services purportedly provided to patients, and (b) the PC Defendants' eligibility to collect No-Fault benefits under New York law.

30.    Allstate reasonably relied on the facial validity of the defendants' documents—and the representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

31.    By this Complaint, Allstate brings this action against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; and (c) unjust enrichment.

32.     This action seeks actual damages in excess of $1,310,403.01 representing "No-Fault" insurance payments that were wrongfully obtained from Allstate by, or on behalf of, the PC Defendants as a direct result of the defendants' unlawful conduct and material misrepresentations.

33.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse the PC Defendants (or their agents) in connection with any past, present, or future claims submitted to Allstate seeking payment under New York's No-Fault laws because, at all relevant times: (a) the PC Defendants were unlawfully controlled by laypersons; (b) the healthcare and diagnostic imaging services were excessive, not clinically necessary, and rendered according to a pre-determined protocol of treatment; (c) the PC Defendants' patient records and bills misrepresented material facts about the identity and employment status of the persons who actually provided the healthcare and diagnostic imaging services; (d) the bills submitted to Allstate by (or on behalf of) the PC Defendants materially misrepresented the nature and extent of the healthcare and diagnostic imaging services that were actually provided to patients; and (e) certain healthcare and diagnostic imaging services were furnished to patients according to unlawful arrangements between the providers to the extent that the treating provider (i.e., Leading Edge Medical Diagnostic) and the source of the referral (i.e., Dassa through Dassa Orthopedic Medical Services; and Datta through Garden State Neuro Stimulation and Datta Endoscopic Back Pain & Surgery Center) were under the common ownership and control of Kostanian, Denevich, Skazka, Khodak, and/or Nimble Business Solutions.

34.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

35.     The defendants' scheme was designed to extract payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the defendants.

36.     In each patient claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants sought—and in many cases obtained—payment for healthcare and diagnostic imaging services that were not compensable under New York's No-Fault laws.

37.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

38.     Allstate estimates that the defendants purposely submitted to Allstate hundreds of bills on behalf of the PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II.     THE PARTIES

### A.     PLAINTIFFS

39.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

40.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

41.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

B.    <u>DEFENDANTS</u>

    1.    <u>**Gabriel Dassa, D.O.**</u>

42.    Dassa resides in and is a citizen of the State of New York.

43.    Dassa is licensed to practice medicine in the State of New York.

44.    Dassa participated in this scheme by providing physician healthcare services to patients of the multidisciplinary clinics through Dassa Orthopedic Medical Services.

45.    Dassa also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and/or shareholder of Dassa Orthopedic Medical Services, and by allowing Kostanian, Denevich, and Khodak to control Dassa Orthopedic Medical Services and profit from its operation.

46.    Even though he did not fully control Dassa Orthopedic Medical Services, Dassa still participated in the operation of the Dassa Orthopedic Medical Services enterprise by signing—or lending his name to—Dassa Orthopedic Medical Services' corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Dassa is responsible for the fraudulent and non-compensable services that were rendered to patients of Dassa Orthopedic Medical Services and billed to Allstate under New York's No-Fault laws.

    2.    <u>**Sukdeb Datta, M.D.**</u>

47.    Datta resides in and is a citizen of the State of New York.

48.    Datta is licensed to practice medicine in the State of New York.

49.    Datta participated in this scheme by providing physician healthcare services to patients of the multidisciplinary clinics through Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, and Datta Endoscopic Back Surgery & Pain Center.

50.    Datta also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and/or shareholder of Garden State Neuro Stimulation and Datta Endoscopic Back Surgery & Pain Center, and by allowing Kostanian, Denevich, and/or Khodak to control Garden State Neuro Stimulation and Datta Endoscopic Back Surgery & Pain Center and profit from their operation.

51.    Even though he did not fully control Garden State Neuro Stimulation and Datta Endoscopic Back Surgery & Pain Center, Datta still participated in the operation of the Garden State Neuro Stimulation and the Datta Endoscopic Back Surgery & Pain Center enterprises by signing—or lending his name to—Garden State Neuro Stimulation's and Datta Endoscopic Back Surgery & Pain Center's corporate and ownership documents, as well as the entities' treatment records and invoices; therefore, Datta is responsible for the fraudulent and non-compensable services that were rendered to patients of Garden State Neuro Stimulation and Datta Endoscopic Back Surgery & Pain Center and billed to Allstate under New York's No-Fault laws.

### 3.    <u>Darrin Kaloz, D.C.</u>

52.    Kaloz resides in and is a citizen of the State of New York.

53.    Kaloz is licensed to practice chiropractic treatment in the State of New York.

54.    Kaloz participated in this scheme by providing chiropractic services to the patients of the multidisciplinary clinics through Dassa Orthopedic Medical Services and Adjust For Life Chiropractic.

55.    Kaloz also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and/or shareholder of Adjust For Life Chiropractic, and by allowing laypersons (i.e., Kostanian, Denevich, and/or Khodak) to control and profit from its operation.

56.     Even though he did not fully control Adjust For Life Chiropractic, Kaloz still participated in the operation of the Adjust For Life Chiropractic enterprise by signing—or lending his name to—Adjust For Life Chiropractic's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Kaloz is responsible for the fraudulent and non-compensable services that were rendered to patients of Adjust For Life Chiropractic and billed to Allstate under New York's No-Fault laws.

### 4.    Yelena Shubina, M.D. (a.k.a. "Yelena Bogoraz")

57.     Shubina resides in and is a citizen of the State of New Jersey.

58.     Shubina is licensed to practice medicine in the State of New York.

59.     Shubina participated in this scheme by providing physician healthcare services to patients of the multidisciplinary clinics through Newburgh Primary Care.

60.     Shubina also participated in this scheme by falsely holding herself out to the public and to Allstate as the sole officer, director, and/or shareholder of Newburgh Primary Care, and by allowing Kostanian, Denevich, and/or Khodak to control Newburgh Primary Care and profit from its operation.

61.     Even though she did not fully control Newburgh Primary Care, Shubina still participated in the operation of the Newburgh Primary Care enterprise by signing—or lending her name to—Newburgh Primary Care's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Shubina is responsible for the fraudulent and non-compensable services that were rendered to patients of Newburgh Primary Care and billed to Allstate under New York's No-Fault laws.

### 5.    Daniel Schlusselberg, M.D.

62.     Schlusselberg resides in and is a citizen of the State of New Jersey.

63.    Schlusselberg is licensed to practice medicine in the State of New York.

64.    Schlusselberg participated in this scheme by providing diagnostic imaging services to the patients of the multidisciplinary clinics through Leading Edge Medical Diagnostic.

65.    Schlusselberg also participated in this scheme by falsely holding himself out to the public and to Allstate as the sole officer, director, and/or shareholder of Leading Edge Medical Diagnostic, and by allowing one or more layperson to control and profit from the operation of Leading Edge Medical Diagnostic.

66.    Even though he did not fully control Leading Edge Medical Diagnostic, Schlusselberg still participated in the operation of the Leading Edge Medical Diagnostic enterprise by signing—or lending his name to—Leading Edge Medical Diagnostic's corporate and ownership documents, as well as the entity's treatment records and invoices; therefore, Schlusselberg is responsible for the fraudulent and non-compensable services that were rendered to patients of Leading Edge Medical Diagnostic and billed to Allstate under New York's No-Fault laws.

### 6.    Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic

67.    Dassa Orthopedic Medical Services is organized as a physician-owned professional corporation under New York law with a principal place of business located at 43 Penwood Road, Bedford Corners, New York.

68.    At all relevant times, Dassa falsely purported to be the sole officer, director, and/or shareholder of Dassa Orthopedic Medical Services.

69.    As set out below, Kostanian and Denevich, by and through Skazka, and Khodak, by and through Nimble Business Solutions, participated in the operation and management of the Dassa Orthopedic Medical Services enterprise by exerting unlawful control over Dassa Orthopedic Medical Services, including Dassa Orthopedic Medical Services' professional fees and profits.

70.     As part of this scheme, Dassa Orthopedic Medical Services was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Dassa Orthopedic Medical Services was unlawfully operated and controlled by laypersons.

71.     Because Dassa Orthopedic Medical Services was unlawfully operated and controlled by laypersons, Dassa Orthopedic Medical Services was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 7.    Garden State Neuro Stimulation, LLC

72.     Garden State Neuro Stimulation is organized as a physician-owned professional corporation under New Jersey law with a principal place of business located at 47 Woodland Avenue, Summit, New Jersey.

73.     At all relevant times, Datta falsely purported to be the sole officer, director, and/or shareholder of Garden State Neuro Stimulation.

74.     As set out below, Kostanian and Denevich, by and through Skazka, and Khodak, by and through Nimble Business Solutions, participated in the operation and management of the Garden State Neuro Stimulation enterprise by exerting unlawful control over Garden State Neuro Stimulation, including Garden State Neuro Stimulation's professional fees and profits.

75.     As part of this scheme, Garden State Neuro Stimulation was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Garden State Neuro Stimulation was unlawfully operated and controlled by laypersons.

76.     Because Garden State Neuro Stimulation was unlawfully operated and controlled by laypersons, Garden State Neuro Stimulation was operated in direct violation of N.Y. Bus. Corp.

Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 8.    Datta Endoscopic Back Surgery & Pain Center, LLC

77.    Datta Endoscopic Back Surgery & Pain Center is organized as a physician-owned professional corporation under New Jersey law with a principal place of business located at 1010 Clifton Avenue, Clifton, New Jersey.

78.    At all relevant times, Datta falsely purported to be the sole officer, director, and/or shareholder of Datta Endoscopic Back Surgery & Pain Center.

79.    As set out below, Kostanian and Denevich, by and through Skazka, and Khodak, by and through Nimble Business Solutions, participated in the operation and management of the Datta Endoscopic Back Surgery & Pain Center enterprise by exerting unlawful control over Datta Endoscopic Back Surgery & Pain Center, including Datta Endoscopic Back Surgery & Pain Center's professional fees and profits.

80.    As part of this scheme, Datta Endoscopic Back Surgery & Pain Center was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Datta Endoscopic Back Surgery & Pain Center was unlawfully operated and controlled by laypersons.

81.    Because Datta Endoscopic Back Surgery & Pain Center was unlawfully operated and controlled by laypersons, Datta Endoscopic Back Surgery & Pain Center was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 9.    Adjust For Life Chiropractic, P.C.

82.    Adjust For Life Chiropractic is organized as a chiropractor-owned professional corporation under New York law with a principal place of business located at 14 Arbor Road, Campbell, New York.

83.    At all relevant times, Kaloz has falsely purported to be the sole officer, director, and/or shareholder of Adjust For Life Chiropractic.

84.    As set out below, Kostanian and Denevich, by and through Skazka, and Khodak, by and through Nimble Business Solutions, participated in the operation and management of the Adjust For Life Chiropractic enterprise by exerting unlawful control over Adjust For Life Chiropractic, including Adjust For Life Chiropractic's professional fees and profits.

85.    As part of this scheme, Adjust For Life Chiropractic was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Adjust For Life Chiropractic was unlawfully operated and controlled by laypersons.

86.    Because Adjust For Life Chiropractic was unlawfully operated and controlled by laypersons, Adjust For Life Chiropractic was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 10.    Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

87.    Newburgh Primary Care is organized as a physician-owned professional corporation under New York law with a principal place of business located at 244 Broadway, Newburgh, New York.

88.    At all relevant times, Shubina has falsely purported to be the sole officer, director, and/or shareholder of Newburgh Primary Care.

89.     As set out below, Kostanian and Denevich, by and through Skazka, and Khodak, by and through Nimble Business Solutions, participated in the operation and management of the Newburgh Primary Care enterprise by exerting unlawful control over Newburgh Primary Care, including Newburgh Primary Care's professional fees and profits.

90.     As part of this scheme, Newburgh Primary Care was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Newburgh Primary Care was unlawfully operated and controlled by laypersons.

91.     Because Newburgh Primary Care was unlawfully operated and controlled by laypersons, Newburgh Primary Care was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 11.     Leading Edge Medical Diagnostic, P.C.

92.     Leading Edge Medical Diagnostic is organized as a physician-owned professional corporation under New York law with a principal place of business located at 290 Broadway, Suite 1, Newburgh, New York.

93.     At all relevant times, Schlusselberg has falsely purported to be the sole officer, director, and/or shareholder of Leading Edge Medical Diagnostic.

94.     As set out below, Khodak participated in the operation and management of the Leading Edge Medical Diagnostic enterprise by exerting unlawful control over Leading Edge Medical Diagnostic, including Leading Edge Medical Diagnostic's professional fees and profits.

95.     Leading Edge Medical Diagnostic engaged in unlawful conduct by seeking and collecting payments for diagnostic imaging studies that were not medically necessary, and by aggressively seeking and collecting payments under New York's No-Faults even though Leading

Edge Medical Diagnostic was not entitled to No-Fault reimbursement because it was unlawfully operated and controlled by laypersons.

96.     Because Leading Edge Medical Diagnostic was unlawfully operated and controlled by laypersons, Leading Edge Medical Diagnostic was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 12.     Arthur Kostanian

97.     Kostanian resides in and is a citizen of New Jersey.

98.     Kostanian has never been licensed to provide professional healthcare services, in any form, in the State of New York.

99.     At all relevant times, Kostanian, individually and through Skazka, participated in the operation and management of the PC Defendants (i.e., Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care) by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

100.    As part of this scheme, Kostanian caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

101.    Even if he did not personally deliver healthcare services to patients, Kostanian still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable healthcare and diagnostic imaging services, and (c) siphoning-off PC Defendants' professional fees and profits; therefore, Kostanian is responsible

for the fraudulent and non-compensable services that were rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault laws.

### 13.    <u>Sergey Denevich</u>

102.    Denevich resides in and is a citizen of New York.

103.    Denevich has never been licensed to provide professional health care services, in any form, in the State of New York.

104.    At all relevant times, Denevich, individually and through Skazka, participated in the operation and management of the PC Defendants (i.e., Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care) by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

105.    As part of this scheme, Denevich caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

106.    Even if he did not personally deliver healthcare services to patients, Denevich still participated in the operation and management of the PC Defendant enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable healthcare and diagnostic imaging services, and (c) siphoning-off PC Defendants' professional fees and profits; therefore, Denevich is responsible for the fraudulent and non-compensable services that were rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault laws.

### 14.    **Skazka, LLC**

107.    Skazka is organized as a domestic business corporation under New York law with a principal place of business located at 253 Route 211, Second Floor, Middletown, New York.

108.    Skazka is owned by Kostanian and Denevich.

109.    At all times relevant, Skazka has controlled the properties located (i) 253 Route 211 East, Middletown, New York, (ii) 244-250 Broadway, Newburgh, New York, (iii) 1 Civic Center Plaza, Suite 107, Poughkeepsie, New York, (iv) 3657 Albany Post Road, Poughkeepsie, New York; and (v) 17 Perlman Drive, Spring Valley, New York.

110.    During the relevant period, Kostanian and Denevich knowingly used Skazka to unlawfully operate the PC Defendants and to unlawfully share in the professional physician fees and profits collected by the PC Defendants.

### 15.    **Gennadi Khodak (a.k.a. "Gene Khodak")**

111.    Khodak resides in and is a citizen of New York.

112.    Khodak has never been licensed to provide professional health care services, in any form, in the State of New York.

113.    At all relevant times, Khodak, individually and through Nimble Business Solutions, participated in the operation and management of the PC Defendants by exerting unlawful control over the PC Defendants, including the PC Defendants' professional fees and profits.

114.    As part of this scheme, Khodak caused the PC Defendants to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though the PC Defendants were unlawfully operated and controlled by laypersons.

115.    Even if he did not personally deliver healthcare and diagnostic imaging services to patients, Khodak still participated in the operation and management of the PC Defendant

enterprises by, among other things, (a) controlling and conducting the PC Defendants' affairs, (b) causing the PC Defendants to seek and collect payments for non-compensable healthcare and diagnostic imaging services, and (c) siphoning-off PC Defendants' professional fees and profits; therefore, Khodak is responsible for the fraudulent and non-compensable services that were rendered to patients of the PC Defendants and billed to Allstate under New York's No-Fault laws.

**16.** **Nimble Business Solutions, Inc. ("Nimble Business Solutions")**

116.    Nimble Business Solutions is organized as a domestic business corporation under New York law with a principal place of business located at 280 Broadway, Suite 11, Newburgh, New York.

117.    Nimble Business Solutions is owned by Khodak.

118.    At all times relevant, Nimble Business Solutions has participated in the management and operation of the properties located at (i) 253 Route 211 East, Middletown, New York, (ii) 244-250 Broadway, Newburgh, New York, (iii) 1 Civic Center Plaza, Suite 107, Poughkeepsie, New York, (iv) 3657 Albany Post Road, Poughkeepsie, New York; and (v) 17 Perlman Drive, Spring Valley, New York.

119.    During the relevant period, Khodak knowingly used Nimble Business Solutions to unlawfully operate the PC Defendants and to unlawfully share in the professional physician fees and profits collected by the PC Defendants.

## III.    JURISDICTION AND VENUE

120.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

121.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

122.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Southern District of New York.

123.    At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws (as detailed *infra*).

124.    The defendants' activities in and contacts with New York were purposefully sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

125.    As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent and non-compensable demands for payment under New York's No-Fault laws, a substantial relationship exists between the transactions at issue and Allstate's causes of action.

## IV.    NO-FAULT LAWS AND LICENSING STATUTES

### A.    NEW YORK'S NO-FAULT LAWS

126.    Allstate underwrites automobile insurance in the State of New York.

127.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

128.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.), and the regulations promulgated pursuant thereto (11 NYCRR § 65, et seq.) (collectively, "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault benefits") to Allstate claimants.

129.    Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

130.    "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

131.    No-Fault benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

132.    A patient can assign his/her No-Fault benefits to healthcare providers.

133.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").

134.    Alternatively, healthcare providers may submit claims to insurance carriers using the Health Care Financing Administration Claim Form (known as the "HCFA-1500" form).

135.    NF-3 and HCFA-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

136.    NF-3 and HCFA-1500 forms contain Current Procedural Terminology ("CPT") codes, which are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers subject to the Health Insurance Portability and Accountability Act are required to use CPT codes when submitting bills.

137.    Pursuant to § 403(d) of the New York State Insurance Law, NF-3s and HCFA-1500s must be verified by the healthcare provider subject to the following warning: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

138.    It is a material misrepresentation to submit NF-3 and HCFA-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

**B.    UNLAWFUL CONTROL OF PROFESSIONAL SERVICE ENTITIES**

139.    New York law requires that all professional healthcare service corporations be owned and controlled by appropriately licensed healthcare professionals.  *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

140.    Similarly, New York law prohibits anyone from engaging in the practice of medicine except those licensed to practice medicine.  *See* N.Y. Educ. Law §§ 6521-6522.

141.    Thus, in New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable to this case—economic benefit from physician services.

142.    Moreover, for a provider of healthcare services to be eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the

actual provider of the service. Under the No-Fault Laws, professional service entities are not eligible to bill for services, or collect for those services from an insurer, where the services were actually rendered by persons who are not employees of the professional service entity, such as independent contractors.

143.    New York's No-Fault laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

144.    New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

145.    New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to an individual unless this individual is "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

146.    Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

147.    New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine.

148.    Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

149.    Licensed physicians are also prohibited from delegating professional responsibilities to persons who lack qualification, training, experience, and/or licensure to perform them.

150.    Further, under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

151.    The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

152.    New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

153.    Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

154.    In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

155.    In *State Farm Mutual Automobile Insurance Company v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional health care services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional health care services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

156.    In the matter *Metroscan Imaging P.C. v. Government Employees Insurance Company*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

157.    As detailed below, the defendants purposely and knowingly violated one or more of the above-cited New York statutes and regulations through the operation and management of Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery and Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic.

## C.    NEW YORK WORKERS' COMPENSATION FEE SCHEDULE

158.    The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

159.    Both healthcare providers and automobile insurers consult the Fee Schedule to determine the level of reimbursement payable on legitimate claims.

160.    The purpose of the Fee Schedule is to: (a) provide comprehensive billing guidelines in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by health care service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

161.    Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "[a]ll necessary expenses incurred for…professional health services," "subject to the limitations of" Insurance Law § 5108.

162.    Insurance Law § 5108(b) provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating" the provisions of the New York No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services" specified in Insurance Law § 5102(a)(2), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

163.    Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board."

## V.    **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

164.    New York's No-Fault system provides generous compensation for accident-related healthcare services, and also requires insurers to make prompt payment on patient claims.

27

165.    The system is designed to facilitate prompt payment of claims when a patient or provider submits facially-valid claim documents, such as invoices that identify the type of services provided, the name of the treating provider, the name of the entity billing for the services, and the name of each person who owns the entity.

166.    The system is vulnerable to fraud and abuse when providers submit claim documents containing material misrepresentations about the necessity of the billed-for services, the name and employment status of the treating provider, and the ownership status of the entity billing for the services.

167.    In general, providing truthful information in support of No-Fault claims is important because the system is designed to prevent delays and force insurers to make prompt payments.

168.    With respect to healthcare providers, providing truthful information about the services and the person or entity that provided the services is important because providers are not eligible to seek or collect payment under New York's No-Fault laws if they fail to meet any New York State or local licensing requirement necessary to perform such service in New York.

169.    As explained below, at all relevant times, the defendants have taken advantage of New York's No-Fault system by operating the PC Defendants in violation of one or more applicable New York state licensing requirement governing the provision of professional physician services.

170.    The defendants, at all times relevant, knew that (a) the PC Defendants were actually controlled by non-physicians (i.e., Kostanian, Denevich, and/or Khodak), and (b) the PC Defendants were caused to unlawfully split professional physician fees and profits with a non-physician.

171.    The control exerted by Kostanian, Denevich, and Khodak—individually and through Skazka and/or Nimble Business Solutions—over the PC Defendants compromised patient care because Kostanian's, Denevich's, and Khodak's financial interests were placed ahead of the patients' well-being.

172.    Kostanian's, Denevich's, and Khodak's control over the operation and management of the PC Defendants drove the PC Defendants to deliver and bill for healthcare and diagnostic imaging services that were not medically necessary.

173.    This wanton and indiscriminate delivery of treatment jeopardized the health and safety of patients because they were needlessly exposed to the risk of further injury or infection through healthcare and diagnostic imaging services they did not need, and because treatment decisions were not based on the individualized medical needs of the patients.

174.    The defendants, at all relevant times, knew that the PC Defendants were not eligible for compensation under New York's No-Fault laws, yet they routinely sought and collected payment from Allstate.

A.    THE UNLAWFUL OPERATION AND CONTROL OF THE PC DEFENDANTS

175.    The scheme to defraud described herein is the latest measure involving Denevich to defraud insurers, including Allstate, in the State of New York.

176.    On or about November 22, 2010, Denevich and Arthur Bogoraz ("Bogoraz") were named as defendants in the matter *Government Employees Ins. Co. et al., v. Damien, et al.*, United States District Court for the Eastern District of New York, Civil Docket No.: 1:10-cv-05409-SLT-JMA, wherein they were alleged to have unlawfully managed and controlled six (6) diagnostic treatment centers through the management company, Alba Management, Inc.

177.    Denevich's participation in this scheme to defraud is conspicuous as it documents his prior participation in the unlawful management and control of professional medical

corporations as a non-licensed layperson and his partnership with the father of his nephew and his sister, Shubina's former significant other (i.e., Bogoraz).

178.    In documents that were filed with the New York Department of Health in connection with a proposed Article 28 diagnostic imaging and treatment center, Denevich has indicated that prior to Skazka, he served as the "administrator" of "Alpha Medical Care, a private practice in Middletown, New York, where he oversaw and supervised administrative staff, as well as medical billing and coding".

179.    Denevich's employment disclosure is notable, as the professional medical corporation was alleged to have falsified patient records to justify medically unnecessary treatment that was rendered, in certain cases, by independent contractors, to patients at the Route 211 East Clinic.  *See Government Employees Insurance Company et al v. Alleyne et al.*, United States District Court for the Southern District of New York, Civil Docket No.: 1:14-cv-01547-GHW.

180.    Remarkably, the telephone number that was once utilized by the aforementioned professional medical corporation is now associated with Dassa Orthopedic Medical Services at the same Route 211 East Clinic.

### 1.    THE Multidisciplinary Clinics

181.    In furtherance of this scheme, Kostanian, Denevich, and/or Khodak recruited Dassa to fraudulently incorporate Dassa Orthopedic Medical Services in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Dassa Orthopedic Medical Services to operate a medical practice.

182.    Once Dassa Orthopedic Medical Services was fraudulently incorporated, Kostanian and Denevich caused the professional medical corporation to begin operating from the facilities that they controlled at 253 Route 211 East, Middletown, New York (the "Route 211 Clinic"), 244-

250 Broadway, Newburgh, New York (the "Broadway Clinic"), 1 Civic Center Plaza, Suite 107, Poughkeepsie, New York (the "Civic Center Clinic"), 3657 Albany Post Road, Poughkeepsie, New York (the "Albany Post Road Clinic"), and 17 Perlman Drive, Spring Valley, New York (the "Perlman Drive Clinic") beginning in 2010.

183.    In an effort to conceal their true ownership and control of Dassa Orthopedic Medical Services, Kostanian and Denevich arranged to have Dassa Orthopedic Medical Services enter into a series written and verbal License and Administrative Services Agreements  to permit Kostanian, Denevich, and Skazka to provide "general administrative", "billing and collection", "bookkeeping", "financial", "advertising" and "public relations" services, as well as the necessary business equipment on Dassa Orthopedic Medical Services' behalf.

184.    In actuality, these agreements provided Kostanian and Denevich with the ability to control the day-to-day operations of the professional medical corporation, exercise supervisory authority, and siphon the revenue that was generated by Dassa Orthopedic Medical Services.

185.    Similarly, on or about June 1, 2011, Dassa Orthopedic Medical Services was caused to enter into an Agreement For Billing and Account Receivable Management Services with Nimble Business Solutions, wherein Nimble Business Solutions would purport to provide "billing", "collection", "coding" and "verification" services.

186.    In actuality, this agreement and the subsequent October 1, 2022 Amendment provided Khodak with the ability to control the day-to-day operation of the professional medical corporation, manage the corporation's assets, and siphon the revenue that was generated by Dassa Orthopedic Medical Services.

187.    Kostanian, Denevich, and Khodak subsequently established the multidisciplinary clinics that were centered on Dassa and Dassa Orthopedic Medical Services by recruiting Datta and Kaloz into the scheme.

188.    Once recruited into the scheme, (i) Datta and Kaloz became employees of Dassa Orthopedic Medical Services, (ii) Datta was caused to incorporate the professional medical corporations Garden State Neuro Stimulation and Datta Endoscopic Back Surgery & Pain Center in his name to circumvent New York law and induce the State Education Department to issue certificates of authority to operate the medical practices; and (iii) Kaloz was caused to transfer the operation of Adjust For Life Chiropractic to the clinics owned and controlled by the Management Defendants.

189.    Upon information and belief, Datta and Kaloz, acting on behalf of their professional medical corporations, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, and Adjust For Life Chiropractic, respectively, were caused to enter into similar License and Administrative Services Agreements and/or billing and collection agreements with Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions in connection with their operation out of the multidisciplinary clinics.

190.    In furtherance of this scheme, Kostanian and Denevich subsequently recruited Denevich's sister, Shubina, to fraudulently incorporate a professional medical corporation (i.e., Newburgh Primary Care) in her name, which subsequently began operating out of the Broadway Clinic.

191.    Despite incorporating the professional medical corporation under Shubina's name, the NYS Department of State Division of Corporation records for Newburgh Primary Care identify Denevich as the Chief Executive Officer.

192.    Once established, Newburgh Primary Care expanded its operation, wherein Shubina and her staff subsequently began treating patients out of six (6) additional locations, including the Route 211 Clinic, the Broadway Clinic, the Civic Center Clinic, and the Perlman Clinic.

193.    The recruitment of Shubina was pivotal to Kostanian and Denevich, as Shubina was enlisted to not only serve as a nominal owner in connection with this scheme, but to also serve as the proposed Medical Director of their prospective Article 28 diagnostic and treatment center, KD Hudson Ventures, LLC d/b/a Avalon Medical Group ("Avalon Medical Group").

194.    The New York Department of Health, Public Health and Health Planning Council's Executive Summary for Project No. 211085-B (hereinafter, the "Executive Summary") indicates that Kostanian and Denevich sought approval to establish and construct an Article 28 diagnostic and treatment center.

195.    The Executive Summary demonstrates that through this project, several private practices that are currently located at 244 Broadway, Newburgh, New York will be relocated and consolidated into the proposed Article 28 diagnostic and treatment center that will be located 121 Executive Drive, New Windsor, New York.

196.    Through the creation of an Article 28 diagnostic and treatment center, Kostanian and Denevich would lawfully be permitted to own and control a healthcare company as laypersons, and thus legitimize their current unlawful management and control of the PC Defendants.

197.    In order to avoid detection and to obscure the fact that employees of Dassa Orthopedic Medical Services (i.e., Datta and Kaloz) were also billing for treatment through professional medical corporations that were incorporated under their names, Kostanian and Denevich purposely limited the signage at each location.

198.    For instance, the Route 211 Clinic is identified by signage that simply reads "CV Orthopedics" with the services "physical therapy", "acupuncture", "chiropractic", "neurology", and "orthopedic" listed in the front windows.

199.    A true and accurate image of the front of the facility located at 253 Route 211 East, Middletown, New York as shown on the Google Maps Street View is depicted below:



200.    Similarly, the signage on the side of the building simply states "Pain Relief", with the services "orthopedic", "neurology", "chiropractic", "acupuncture", and "pain management" listed, without identifying the actual professional medical corporations that purport to offer treatment at this location.

201.    A true and accurate image of the side of the facility located at 253 Route 211 East, Middletown, New York as shown on the Google Maps Street View is depicted below:



202.    Likewise, the signage for the Broadway Clinic simply reads "Central Valley Orthopedic Rehabilitation" and "Pain Relief", with the services "pain management", "hand surgery", "orthopedic", "knee surgery", "physical therapy", "spine surgery", "chiropractic", and "shoulder surgery" listed below, without identifying the actual professional medical corporations that purport to offer these services at this location.

203.    A true and accurate image of the facility located at 244-250 Broadway, Newburgh, New York as shown on the Google Maps Street View is depicted below:



204.    Although the signage does identify a website (i.e., www.cvorthopedic.com), this website previously only identified Dassa, Datta, and Kaloz as "Specialists" without identifying each of the professional medical corporations that operated out of these locations.

205.    Notably, in 2022, the website "www.cvorthopedic.com" began to redirect browsers to the website "https://www.elite-orthopedics.com", which identifies only the staff for Newburgh Primary Care and does not include Dassa, Datta, nor Kaloz.

206.    Conspicuously, the telephone number utilized at the Broadway Clinic (i.e., (845) 784-4131) by Dassa and Shubina is also associated with Skazka.

## 2.    Leading Edge Medical Diagnostic

207.    In conjunction with the operation of the multidisciplinary clinics at the multidisciplinary clinics, and in furtherance of the scheme of fraud, Dassa recruited Schlusselberg in an effort to establish a diagnostic imaging center.

208.    According to testimony provided by Schlusselberg, Dassa and two other physicians asked him to open a diagnostic imaging center in Newburgh, New York as they were aware of his work and "liked" his readings.

209.    True and accurate excerpts from Daniel Schlusselberg, M.D.'s February 18, 2021 Examination Under Oath testimony on behalf of Leading Edge Medical Diagnostics are depicted below:

Q.    Who asked you to set up Leading
Edge?

A.    Physicians.

Q.    What physician was that?

A.    One physician was Dr. Gary
Friedman.

Q.    Who else asked you to open up
Leading Edge?

A.    Other physicians.  Dr. Dassa,
D-A-S-S-A; Dr. Blumenthal,
B-L-U-M-E-N-T-H-A-L.  Those are the main
physicians who asked me about it.

Q.    About opening up Leading Edge?

A.    Yes.

***

Q.    Why did Dr. Freidman, Dr. Dassa
Dr. Blumenthal, approach to you open up
Leading Edge?

A.    They liked my readings while I
was work in Queens.  They had an
opportunity to see my reports, and they
also like me a physician, as a radiologist.

210.    In actuality, Dassa was aware that Schlusselberg's reports frequently contained false positive reads and a trend of reading radiology studies that exaggerated the patients' alleged injuries.

211.    By recruiting Schlusselberg and causing him to fraudulently incorporate Leading Edge Medical Diagnostic, the defendants established a method to justify the medical necessity of

the prolonged and excessive healthcare services that were purportedly provided to patients of the multidisciplinary clinics via the use of false and misrepresented diagnostic reports.

212.    The utilization of the medically unnecessary diagnostic imaging and subsequent inaccurate reports furthered the defendants' scheme to maximize their profits without improving the condition of the Healthcare Defendants Providers' patients.

213.    As such, the referral for diagnostic imaging at Leading Edge Medical Diagnostic was subsequently introduced into the Healthcare Provider Defendants' predetermined treatment protocol.

214.    In furtherance of this scheme, Leading Edge Medical Diagnostic was purposely incorporated under Schlusselberg's name in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Leading Edge Medical Diagnostic to operate a diagnostic imaging center.

215.    In reality, and at all times relevant, Leading Edge Medical Diagnostic was operated and controlled by its purported "Office Manager", Khodak, a non-licensed layperson.

216.    Schlusselberg and Khodak first became acquainted in 1997 when Schlusselberg performed reads at a diagnostic imaging center in Middle Village, New York where Khodak, through his management company, owned the MRI equipment and served as the Office Manager.

217.    The operation of the Middle Village diagnostic imaging center continued until approximately January 2010, when the owner of the property where the diagnostic imaging center was located obtained a $163,359.00 judgement against Khodak's management company.

218.    Notably, just less than three (3) weeks after the entry of the judgment, Leading Edge Medical Diagnostic was caused to be incorporated.

219.    Schlusselberg has previously testified that Leading Edge Medical Diagnostic was incorporated by an accountant (i.e., Simon Bolonik, CPA), who was introduced to him by Khodak.

220.    In leading up to the incorporation of Leading Edge Medical Diagnostic, Khodak was instrumental in assisting with the negotiation of the lease agreement for the use of the office space located at 333 Broadway, Suite 2, Newburgh, New York.

221.    Although Schlusselberg previously testified that Khodak was not authorized to enter into agreements on behalf of Leading Edge Medical Diagnostic, the lease agreement conspicuously identifies Khodak as the Tenant signatory.

222.    Khodak subsequently participated in the build out of the office space located at the 333 Broadway, Suite 2, Newburgh, New York and helped establish the professional medical corporation's operation out of this facility as the "Office Manager".

223.    In doing so, Leading Edge Medical Diagnostic began using the telephone number (i.e., (845)-562-4547), which was further utilized by the medical management company owned and operated by Khodak's wife within the same office building.

224.    Although Khodak was provided the title of "Office Manager", his day-to-day involvement at the diagnostic imaging center far exceeds the marketing services that he was reportedly hired to perform.

225.    According to testimony provided by Schlusselberg, Khodak was involved in the subsequent negotiation of the terms of the lease agreements and the build out at the office space located at 290 Broadway, Newburgh, New York.

226.    In light of Schlusselberg's limited time present at Leading Edge Medical Diagnostic, Khodak was (i) responsible for the supervision, hiring, firing, and scheduling of the staff; (ii) responsible for responding to insurance companies' requests for verification; (iii)

provided with access to Schlusselberg's signature stamp, which was kept in Khodak's office; (iv) provided with a corporate credit card; (v) listed as a signatory on the JP Morgan Chase bank account; (vi) provided with access to the corporate records and bookkeeping; and (vii) responsible for providing the necessary documentation to the accountant, who was recommended by Khodak, for the preparation of the corporation's tax returns.

227.    Through Khodak's management and control of the professional medical corporation, Schlusselberg was at best, nothing more than an employee of Leading Edge Medical Diagnostic, who was tasked with reading and interpreting MRI films and other radiology studies.

228.    As Khodak was responsible for the day-to-day operation of the diagnostic imaging center, Schlusselberg was able to perform these reads and interpret MRI films and other diagnostic studies from his home office through the use of teleradiology, thus limiting his presence at Leading Edge Medical Diagnostic.

229.    In fact, it was virtually impossible for Schlusselberg to maintain a regular presence at the diagnostic imaging center or exercise any meaningful control over Leading Edge Medical Diagnostic, as Schlusselberg served as an officer, director, and/or shareholder of at least four (4) other diagnostic imaging centers during his nominal "ownership" of Leading Edge Medical Diagnostic.

   **B.    FRAUDULENT TREATMENT PROTOCOL**

   **1.    The Multidisciplinary Clinics' Treatment Protocol**

230.    The multidisciplinary clinics were specifically designed to deliver as many healthcare services and tests as possible without any regard for the individual needs of the patients.

231.    In this case, Allstate Claimants typically presented with soft tissue sprains and strains with degenerative-type changes reflected on the patients' MRI scans, generally meaning that the injuries were minor and likely not related to the alleged accident.

232.    Dassa, Datta, and Kaloz were the entry points for the treatment, as patients presented to Dassa through Dassa Orthopedic Medical Services for orthopedic services, Datta through either Garden State Neuro Stimulation or Datta Endoscopic Back Surgery & Pain Center for pain management services, or Kaloz through Adjust For Life Chiropractic for chiropractic care.

233.    Upon initiating treatment with Dassa, Datta, or Kaloz, the Allstate Claimants would undergo an initial examination before being recommended to undergo a course of treatment that called for an array of medical services by the providers at the multidisciplinary clinics.

234.    Indeed, nearly every Allstate Claimant was ordered undergo physical therapy and chiropractic care at the multidisciplinary clinics, with many patients also receiving acupuncture treatment.

235.    Allstate Claimants were routinely given these orders even though soft-tissue sprains and strains in patients are self-limiting and typically respond to conservative care within days to a few weeks, with more severe strains taking up to approximately 12 weeks to recover.

236.    Such conservative care measures may include anti-inflammatory or pain relieving medications (e.g., Acetaminophen) with a short course of physical therapy or chiropractic care.

237.    Clinically, it is reasonable for patients with such soft-tissue injuries to receive _either_ physical therapy _or_ chiropractic care—but not both—for a brief interval of time following the motor vehicle accident with a rapid transition to a home-exercise program.

238.    At the multidisciplinary clinics, Allstate Claimants were referred for concomitant physical therapy at Dassa Orthopedic Medical Services and chiropractic care with Kaloz at Adjust For Life Chiropractic.

239.    In the majority of cases, Allstate Claimants were referred for neurological consultations, which nearly always included electrodiagnostic studies, with Datta through either Garden State Neuro Stimulation or Datta Endoscopic Back Surgery & Pain Center.

240.    In order to justify the referral for the neurological consultations, Dassa frequently misrepresented and/or exaggerated the Allstate Claimants' subjective complaints to include findings that were not present or in direct contrast to the reported examination findings from the acute emergency records.

241.    In many cases, Allstate Claimants were given prescriptions for MRIs, durable medical equipment ("DME") items, and medications, and then steered to other providers involved in this scheme (i.e., Leading Edge Medical Diagnostic) to fulfill these orders.

242.    The referral for MRIs, DME items, and medications were primarily ordered at the conclusion of Dassa's initial examination and before the Allstate Claimants had even begun, let alone completed, a conservative course of treatment.

243.    With regard to the MRIs, Allstate Claimants were referred to Leading Edge Medical Diagnostic, where the tests and evaluations provided a basis-albeit false-to continue patient care.

244.    In many cases, patients received arthroscopic treatment through Dassa for shoulder impingement or for knee pathology that would not be expected as a traumatic finding based on the mechanism of the motor vehicle accident nor related to the patients' alleged injuries.

245.    As part of their scheme, Allstate Claimants were kept in the Defendants' care as long as insurance coverage was available.

246.    In most cases, Allstate Claimants were placed on a course of treatment that lasted well in excess of the recommended maximum three (3) months of care that would generally be required to resolve self-limited soft tissue injuries, where in some instances patients received over 100 separate treatments.

247.    Overall, the Defendants created a system where patients were indiscriminately subjected to a regimen of healthcare and diagnostic imaging services that were (a) medically unnecessary; (b) fraudulently reported; (c) falsely billed; (d) part of a pre-determined treatment protocol; and (e) provided for the sole purpose of maximizing the profits of the providers rather than improving the condition of the patient.

248.    Because the tests and serviced provided to Allstate Claimants at the multidisciplinary clinics were (a) not medically necessary, (b) rendered pursuant to an unlawful referral and financial agreement, (c) rendered pursuant to a predetermined treatment protocol; (d) provided for the sole purpose of maximizing the profits of the Defendants rather than improving the condition of each patient; and (e) falsely billed, the No-Fault benefit claims submitted by the PC Defendants for these healthcare and diagnostic imaging services are not compensable.

249.    To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted to Allstate in connection with any healthcare and diagnostic imaging services provided to patients of the multidisciplinary clinics, including but not limited to, those payments listed in Exhibits 7 – 12, Allstate is entitled to recover all payments made to the PC Defendants in connection with any such services.

250.    Additionally, to the extent that any of PC Defendants' charges submitted in connection with these healthcare and diagnostic imaging services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those healthcare

and diagnostic imaging services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

251.    The following examples serve to demonstrate, with particularity, how the defendants exploited their patients and defrauded Allstate by providing and then billing for tests and serviced that were false, fraudulent, and not compensable under New York's No-Fault laws.

### a.    Patient G.A. (Claim No. 0457402030)

252.    Patient G.A. (Claim No. 0457402030) was reportedly involved in a motor vehicle accident on May 15, 2017.

253.    G.A. subsequently sought treatment at the St. Luke's Cornwall Hospital emergency department with complaints of right shoulder pain radiating to the right arm, which was attributed to the right side of G.A.'s body striking the sidewall of the vehicle as a result of the impact.

254.    At the time of the examination, G.A. specifically denied neck pain, back pain, and weakness.

255.    As a result of the examination, G.A. was diagnosed with a cervical sprain, right shoulder sprain/strain, and "minor injuries from motor vehicle accident."

256.    G.A. was prescribed ibuprofen, oxycodone/acetaminophen, and methocarbamol and was discharged from the hospital.

257.    On May 24, 2017, only nine (9) days after the alleged motor vehicle accident, G.A. presented at Dassa Orthopedic Medical Services where she initiated care with Dassa.

258.    Dassa noted complaints of neck and right shoulder pain, as well as "burning, numbness, and tingling radiating down to her extremities."

259.    Dassa further noted that G.A. had tenderness diffusely from C1 through C7 as well as tenderness over the subacromial bursa, supraspinatus, and bicep.

260.     As a result of these purported findings, Dassa diagnosed G.A. with a sprain/strain and "multiligamentous injury" of the cervical spine.

261.     At the conclusion of the initial examination, Dassa recommended that G.A. undergo a course of physical therapy and chiropractic treatment and indicated that MRI studies would be considered if there were no improvements.

262.     G.A. subsequently initiated chiropractic care at Adjust For Life Chiropractic as well as physical therapy treatment at Dassa Orthopedic Medical Services, wherein G.A. underwent 35 sessions of chiropractic treatment through June 6, 2017 and 57 physical therapy sessions through July 11, 2018.

263.     On June 5, 2017, just under three (3) weeks after the alleged motor vehicle accident, G.A. underwent a cervical spine MRI at Leading Edge Medical Diagnostic on June 5, 2017.

264.     The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described a central disc herniation at C4-5 as well as disc bulges as C2-3, C3-4, C5-6, and C6-7.

265.     As a result of these findings, Dassa referred G.A. for pain management services at Garden State Neuro Stimulation.

266.     G.A. initiated treatment at Garden State Neuro Stimulation on June 21, 2017, only five (5) weeks after the subject loss.

267.     G.A. ultimately continued treating with the PC Defendants through April 2018, wherein she was subjected to a right shoulder MRI at Leading Edge Medical Diagnostic on June 28, 2017; the prescription of compounded pain medications and ointments; cervical epidural injections on August 11, 2017, August 25, 2017, and September 14, 2017; and a right shoulder arthroscopic surgery performed by Dassa on December 6, 2017.

268.   Despite requesting a release to return to work full time on April 25, 2018, which was granted by Datta, G.A. was recommended to continue to undergo physical therapy and chiropractic treatment.

269.   With regard to medical necessity, the patient's complaint of right shoulder pain and denial of neck and back pain on the date of loss were/are insufficient to support diagnostic imaging and suggest a relatively soft tissue injury consistent with a minor cervical sprain/strain and right side contusion, which would generally recovery within approximately four (4) to six (6) weeks.

270.   The extensive course of concomitant chiropractic care and physical therapy cannot be seen to be medically necessary, as these soft tissue injuries would generally be treated by a short course of either chiropractic care or physical therapy as well as an anti-inflammatory and short-term muscle relaxant.

271.   With regard to the shoulder, as a result of the reported motor vehicle accident, G.A. sustained a mechanism of injury that would be consistent with a contusion or a sprain/strain.

272.   G.A. did not sustain a mechanism of injury that would lead to a superior labral tear, which at G.A.'s age (i.e., 50 years old), is degenerative in nature and unrelated to the trauma.

273.   In light of G.A.'s reported injuries and the MRI report that did not show posttraumatic findings, the arthroscopic shoulder surgery is not justified as medically necessary nor related to the reported motor vehicle accident.

274.   Further, the referral for epidural injections (only five (5) weeks post loss and before a course of conservative treatment could be rendered) is not medically necessary.

275.   In connection with the treatment that was purportedly rendered to the patient, G.A., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Adjust For Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate,

through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to G.A.

276.     The documentation submitted to Allstate by the defendants demonstrated that G.A. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

**b.     Patient T.S. (Claim No. 0533210324)**

277.     Patient T.S. (Claim No. 0533210324) was reportedly involved in a motor vehicle accident on October 23, 2018.

278.     At the time of the reported motor vehicle accident, T.S. complained of right shoulder, right clavicle, and right upper arm discomfort, with radiating pain to the right anterior chest.

279.     T.S.'s cervical spine, thoracic spine, and lumbar spine were reported to have no abnormalities by the responding emergency medical personnel.

280.     T.S. was transported to the St. Luke's Cornwall Hospital emergency department for further evaluation, where additional complaints of upper abdominal, back, and leg pain were noted.

281.     An examination at the St. Luke's Cornwall Hospital showed: (1) a CT scan of the cervical spine that was negative for fracture and revealed no significant disc or facet abnormality; (2) right shoulder x-rays that were negative for acute abnormality; (3) right humerus x-rays that were negative for acute abnormality; and (4) cervical spine radiographs that revealed degenerative disc disease at C5-6. and a nonspecific diagnosis of musculoskeletal pain was ultimately given.

282.     At the conclusion of the examination, T.S. was provided with a nonspecific diagnosis of musculoskeletal pain and was prescribed ibuprofen and Tramadol.

283.    Although T.S. was further instructed to return to the emergency department for any worsening or new complaints, T.S. did not return for any acute care.

284.    On February 14, 2019, just under four (4) months after the subject loss, T.S. was evaluated by an orthopedist and underwent a MRI of the right shoulder and lumbar spine.

285.    The report generated by the radiologist with regard to the right shoulder described a 0.7 cm diameter paralabral cyst at the posterosuperior shoulder, with the labrum being suboptimally assessed, as there was a paucity joint fluid.  These findings were thought to be suspicious for a possible underlying labral tear.

286.    Notably, the long head of the biceps tendon and rotator cuff were both noted to be intact.

287.    With regard to the lumbar spine, the report describes a small left paracentral disc herniation at L1-2 and a small broad-based central disc herniation at L5-S1.  These abnormalities were reported to be "of indeterminate age and chronicity."

288.    T.S. sought treatment from Dassa, who performed an initial evaluation on February 26, 2019.

289.    Despite being over four (4) months from the subject loss, Dassa noted complaints of pain in the neck, back, and right shoulder as a result of a "T-bone collision."

290.    Dassa reported that the lumbar spine MRI documented "multilevel disc herniation" and that the MRI of the right shoulder documented impingement syndrome with a labral tear and rotator cuff tendinosis.

291.    As a result of the examination, Dassa diagnosed T.S. with a sprain/strain of the cervical spine, lumbar spine multilevel disc herniation, and right shoulder impingement syndrome with labral tear.

292.     Dassa recommended that T.S. undergo both physical therapy and chiropractic care, referred T.S. for a MRI of the cervical spine and pain management, and discussed a corticosteroid injection.

293.     On February 26, 2019, T.S. underwent a MRI of the cervical spine at Leading Edge Medical Diagnostic.

294.     The report generated by Leading Edge Medical Diagnostic described a broad-based disc herniation at C5-6 as well as disc bulging at C3-4, C4-5, and C6-7, with bilateral foraminal narrowing at C3-4, C4-5, and C5-6.  The findings were noted to be described in the presence of degenerative disc disease with disc desiccation and associated cervical spondylosis.

295.     T.S. subsequently initiated a pain management evaluation with Datta on March 6, 2019 based on the referral from Dassa.

296.     Datta noted that T.S. had a history of a previous neck injury and neck pain, but suggested that the October 23, 2018 motor vehicle accident had worsened and re-aggravated the patient's pain.

297.     At the conclusion of the evaluation, Datta recommended that T.S. undergo electrodiagnostic studies of both the upper and lower extremities and recommended both physical therapy and chiropractic care.

298.     Through his course of treatment, T.S. was prescribed various compounded pain creams and ointments, and was provided with a subacromial corticosteroid injection by Dassa on April 9, 2019.

299.     With regard to the medical necessity, the patient's complaint of right shoulder pain and subsequent findings on the date of loss were/are insufficient to support diagnostic imaging and

suggest a relatively soft tissue injury consistent with a sprain/strain of the neck and a sprain/strain or contusion of the right arm, which would generally recover within days to a few weeks.

300.    As T.S. did not seek additional treatment for nearly four (4) months after the reported motor vehicle accident, the new complaints of back pain that were not present at the emergency room cannot be viewed to be related to the reported motor vehicle accident.

301.    The lack of acute ongoing care would suggest a self-limited soft tissue injury rather than a structural abnormality for the shoulder.

302.    In the event that T.S. had sustained an acute labral tear, the patient would have been expected to undergo further evaluation and treatment prior to four (4) months after the reported motor vehicle accident.

303.    In light of the lack of radicular complaints nor neurological findings and the patient's prior issues involving the neck -with the MRI report noting the degenerative changes- an acute disc herniation cannot be viewed as related to the reported motor vehicle accident.

304.    The concomitant treatment of physical therapy and chiropractic care as well as the prescription of the multitude of compounded medication prescriptions and chronic use of muscle relaxants is therefore medically unnecessary.

305.    In connection with the treatment that was purportedly rendered to the patient, T.S., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, and Leading Edge Medical Diagnostic, submitted documentation to Allstate, through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to T.S.

306.    The documentation submitted to Allstate by the defendants demonstrated that T.S. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

c.    **Patient A.B. (Claim No. 0527539431)**

307.    The patient A.B. (Claim No. 05278539431) was reportedly involved in a motor vehicle accident on December 10, 2018.

308.    On December 11, 2018, A.B. presented to an urgent care center with complaints of (1) left-sided chest pain from striking the steering wheel; (2) right wrist pain, which was attributed to bracing for the impact; (3) bilateral knee pain from striking the dashboard; and (4) neck pain.

309.    Radiographs of the left elbow and right wrist revealed no acute fracture, while radiographs of the chest revealed a possible fracture at the tip of the left 10th rib.

310.    At the conclusion of the examination, A.B. was diagnosed with contusions to the knees, elbow, and chest and was instructed to take over-the-counter medication and to apply ice to the afflicted areas.

311.    On December 19, 2018, only nine (9) days after the reported motor vehicle accident, A.B. presented at Dassa Orthopedic Medical Services where he initiated care with Dassa.

312.    In contrast to the urgent care center records, Dassa noted that A.B. complained of pain in the lumbar spine, left elbow, right knee, and right wrist.

313.    After performing an initial evaluation, Dassa provided multiple diagnoses, including sprains and strains of the lumbar spine, right wrist, right knee, and left elbow, as well as a left elbow contusion.

314.    Dassa further suggested an impression of "multiligamentous injury" of the lumbosacral spine.

315.    Dassa recommended MRI studies of both the right knee and right wrist, despite the fact that A.B. was only nine (9) days removed from the subject loss and had not received any conservative care.

316.    Although a corticosteroid injection was offered, A.B. declined the treatment.

317.    At the conclusion of the examination, Dassa recommended both physical therapy and chiropractic care.

318.    Further, although MRIs of the right knee and right wrist were performed on January 7, 2019 at Mid Rockland Imaging, Dassa was unhappy with the studies and recommended that A.B. undergo new MRI studies at Leading Edge Medical Diagnostic.

319.    In addition to the previously ordered MRIs of the right knee and right wrist, Dassa ordered MRI studies of the neck, back, and left elbow.

320.    On February 23, 2019, A.B. underwent a MRI of the cervical spine at Leading Edge Medical Diagnostic, wherein it was reported that the study showed disc bulging at C2-3, C3-4, C4-5, C5-6, and C6-7, with right foraminal narrowing at C3-4 and bilateral foraminal narrowing at C5-5.

321.    There was no report of a disc herniation nor a posttraumatic abnormality.

322.    On the same day, a MRI of the left elbow was performed, wherein the study showed motion degradation with fluid in the "olecranon recess" and "lateral epicondylar recess", which the radiologist (i.e., Schlusselberg), suggested were "consistent with internal derangement." However, no specific internal derangement was described otherwise, with the tendons and ligaments above the elbows reported to be unremarkable.

323.    On March 9, 2019, A.B. underwent a MRI of the lumbar spine at Leading Edge Medical Diagnostic, wherein the study showed a broad-based disc herniation at L3-4, a central disc herniation at L4-5, and a central and left paracentral disc herniation at L5-S1.

324.    The study further revealed disc bulging at L1-2 and L2-3, with bilateral neural foraminal narrowing with lateral recess stenosis at all levels of the lumbar spine for the 26-year-old patient.

325.    In light of these findings, Dassa recommended further physical therapy and chiropractic care, and prescribed additional Motrin, Skelaxin, and lidocaine 5% ointment.

326.    Although a corticosteroid injection was again offered, A.B. refused the treatment.

327.    On August 26, 2019, a repeat right knee MRI was performed at Leading Edge Medical Diagnostic.

328.    The report generated in connection with the right knee MRI described a tearing of both the medial and lateral meniscus with patellar tendinosis, a small popliteal cyst, and a small "lateral effusion".

329.    Notably, the report from Leading Edge Medical Diagnostic vastly differs from the January 8, 2019 report from Mid Rockland Imaging, which revealed only a small Baker cyst with no meniscal tearing and an otherwise unremarkable report.

330.    On October 8, 2019, nearly 10 months after the subject loss, A.B. was once again examined by Dassa, who recommended further therapy and a return to the office in six (6) weeks

331.    With regard to medical necessity, the patient's complaints of left-sided chest pain, right wrist pain, bilateral knee pain, and neck pain and subsequent findings on the day after the loss were/are insufficient to support diagnostic imaging and suggest relatively soft tissues injuries consistent with sprains/strains and contusions that would generally recover within days to a few weeks.

332.    Such soft tissue injuries would generally be treated with anti-inflammatory medication or acetaminophen, short-term muscle relaxants, modified activity, and a short course of physical therapy or chiropractic treatment.

333.    The concomitant treatment of physical therapy and referral for MRI studies only nine (9) days after the reported motor vehicle accident and before a course of conservative care could be initiated are medically unnecessary.

334.    Further, the referral for five (5) MRI studies at one time cannot be justified as medically necessary.

335.    In connection with the treatment that was purportedly rendered to the patient, A.B. the defendants, Dassa Orthopedic Medical Services and Leading Edge Medical Diagnostic, submitted documentation to Allstate, through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to A.B.

336.    The documentation submitted to Allstate by the defendants demonstrated that A.B. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

**d.    Patient J.F. (Claim No. 0306087685)**

337.    The patient J.F. (Claim No. 0306087685) was reportedly involved in a motor vehicle accident on November 12, 2013.

338.    J.F. was transported by ambulance to St. Luke's Cornwall Hospital wherein the patient had complaints of head pain.

339.    The evaluation at the St. Luke's Cornwall Hospital emergency department revealed that J.F. was noted to show a full range of motion with no deformity, edema, or ecchymosis.

340.    A CT scan of the head and cervical spine revealed no posttraumatic findings, and a CT scan of the chest, abdomen, and pelvis showed no acute pathology.

341.    In light of J.F.'s complaint of "only some head pain" and the aforementioned negative findings, J.F. was discharged with a diagnosis of "musculoskeletal pain" and was prescribed naproxen.

342.    On November 14, 2013, only two (2) days after the reported motor vehicle accident and only two (2) days after he was examined at the emergency department, J.F. presented at Adjust For Life Chiropractic.

343.    J.F. would subsequently undergo 80 chiropractic sessions between November 14, 2013 and December 29, 2014, which included 80 concomitant physical therapy visits at Dassa Orthopedic Medical Services over the same time period.

344.    On November 18, 2013, only six (6) days after the reported motor vehicle accident, J.F. sought pain management services with Datta, wherein he reported complaints of pain in the neck, head, upper back, mid back, lower back, left shoulder, and left knee.

345.    After performing an initial evaluation, Datta diagnosed J.F. with multiligamentous injuries of the cervical, thoracic, and lumbar spine, as well as both cervical and lumbar radiculopathy.

346.    Further, Datta provided a nonspecific diagnosis of "internal derangement" for the left shoulder and left elbow.

347.    Despite being only six (6) days removed from the subject loss, Datta referred J.F. for MRI studies of the cervical spine, thoracic spine, lumbar spine, left shoulder, and left elbow.

348.    Each of the five MRIs were subsequently performed at Leading Edge Medical Diagnostic.

349.    On December 23, 2013, an initial evaluation was conducted by Dassa, who recommended that J.F. follow with the MRI studies for the cervical spine, lumbar spine, left shoulder, and left knee.  Dassa further recommended that J.F. continue the course of chiropractic care and physical therapy that was initiated on November 14, 2013.

350.    On December 19, 2013, J.F. underwent MRIs of the cervical spine and lumbar spine at Leading Edge Medical Diagnostic.

351.    The report generated by Leading Edge Medical Diagnostic with regard to the cervical spine showed a "broad bulging disc" at C3-4, with no herniation or posttraumatic abnormality described.

352.    With regard to the lumbar spine, the study showed a "broad bulging disc" at L4-5, with no herniation or posttraumatic abnormality described.

353.    Despite these findings and a lack of neural compressive pathology, Datta stated, "It is very important to see if the disc bulges have produced significant nerve injury and nerve damages" and added that an EMG and nerve conduction study was medically necessary "considering the requirements of AANEM (the American Association of Neuromuscular & Electrodiagnostic Medicine)."

354.    As such, Datta subsequently performed lower extremity electrodiagnostic studies despite the relatively young 30-year-old patient having no focal radicular symptoms nor neurocompressive pathology on imaging.

355.    At the conclusion of the testing, Datta noted that the patient would "continue to follow-up for possible epidural injections", which were later performed on February 19, 2014.

356.    Throughout the course of this course of treatment, J.F. continued to be re-examined by Dassa, who recommended pain management follow-up visits with Datta.

357.    On March 6, 2014, J.F. underwent a MRI of the left knee at Leading Edge Medical Diagnostic.

358.    The report generated by Leading Edge Medical Diagnostic showed that an "acute complex tear is present in the posterior horn of the lateral meniscus," with "fluid signal in the posterior horn of the medial meniscus most likely representing changes related to the underlying meniscal injury/degeneration." During a re-evaluation with Dassa on May 27, 2014, Dassa recommended that J.F. undergo left knee arthroscopy, which was subsequently performed on June 21, 2014.

359.    In connection with the knee surgery, Dassa ordered a CPM device for the knee at a charge of $2,640.00.

360.    In subsequent follow-up appointments with Dassa on July 8, 2014 and September 2, 2014, further physical therapy and continued chiropractic treatment was recommended.

361.    Moreover, in subsequent follow-up appointments with Datta, a series of continued lumbar epidural injections were also recommended.

362.    These injections were later performed by Datta on November 18, 2014, and by Febin Melepura, M.D., one of Datta's associates, on December 3, 2014.

363.    With regard to medical necessity, the patient's complaint of head pain and subsequent findings on the date of loss were/are insufficient to support diagnostic imaging and suggest a relatively soft tissue injury consistent with mild sprains of the neck and back, which would generally recover within days to a few weeks.

364.    A short course of chiropractic care or physical therapy would be reasonable, but extensive concomitant chiropractic care and physical therapy beyond the time of resolution is medically unnecessary.

365.    As such, 80 dates of service for concomitant chiropractic care and physical therapy cannot be medically justified.

366.    Moreover, the introduction of pain management only six (6) days after the reported motor vehicle accident and ordering of MRIs before a course of conservative care could be initiated is inappropriate.

367.    The course of treatment recommended by Datta (i.e., electrodiagnostic testing and epidural injections) are further not medically necessary, as the patient did not exhibit the required findings or complaints to warrant this type of testing and treatment.

368.    Lastly, with regard to the patient's left knee, J.F. had no joint pain and a full range of motion immediately after the reported motor vehicle accident.

369.    The mechanism of injury here would be atypical for the development of a meniscus tear, and it is notable that such a diagnosis was not indicated when J.F. requested a release to return to work on January 7, 2014.

370.    In connection with the treatment that was purportedly rendered to the patient, J.F., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Adjust For Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate, through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.F.

371.    The documentation submitted to Allstate by the defendants demonstrated that J.F. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

372.    In connection with the treatment that was purportedly rendered to the patient, J.F., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Adjust For

Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate, through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.F.

373.    The documentation submitted to Allstate by the defendants demonstrated that J.F. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

        e.    **Patient T.C. (Claim No. 0279213649)**

374.    The patient T.C. (Claim No. 0279213649) was reportedly involved in a motor vehicle accident on March 13, 2013.

375.    As a result of the reported motor vehicle, the patient did not require immediate medical attention and instead returned to his residence.

376.    Later that evening, T.C., a 63-year old with a history of chronic back pain, presented to the emergency department with complaints of pain in the posterior head, neck, and back.

377.    After an examination and radiographs of the cervical spine and lumbar spine, which revealed straightening with mild cervical spondylosis and well preserved disc spaces in the lumbar spine, T.C. was diagnosed with sprains of the cervical spine, left trapezius, and lumbar spine.

378.    T.C. was provided with Toradol, prescribed Robaxin, and was referred to follow up with an orthopedist.

379.    On March 22, 2013, only nine (9) days after the reported motor vehicle accident, T.C. initiated care with a physiatrist.

380.    At the time of the initial evaluation with the physiatrist, T.C. complained of left neck and shoulder girdle pain and spasm, mid-back pain, right hand and thumb pain, and numbness

and tingling in the left arm.  T.C. was noted to report mild low-back pain with no radiation to the lower extremities.

381.    As a result of the examination, the physiatrist diagnosed T.C. with cervical whiplash, a lumbar strain, and a left shoulder "disorder of bursae", which was further described as a strain.

382.    At the conclusion of the examination, T.C. was prescribed Naprosyn, cyclobenzaprine, and physical therapy, and was further referred for a MRI of the left shoulder and rotator cuff.

383.    T.C. subsequently began to receive physical therapy and continued to see this physiatrist for follow-up examinations through January 6, 2014.

384.    During this course of treatment, T.C. underwent a MRI of the lumbar spine, which was viewed as "unremarkable", with no disc herniation nor report of neurocompressive pathology.

385.    Near the end of his treatment with the physiatrist, T.C.'s neck and shoulder girdle pain was noted to have improved, and on the final date of service, T.C. declined the offer for trigger point injections for the lumbar spine.

386.    On April 14, 2014, well over a year after the reported motor vehicle accident, T.C. initiated care with Datta, wherein he reported complaints of pain in the neck, upper back, mid back, lower back, left shoulder, and left leg.  Although no additional description of his pain complaints were noted, T.C. reportedly the pain intensity as a 7/10.

387.    Based on the initial evaluation, Datta diagnosed T.C. with six (6) different diagnosis, including "clinical cervical radiculopathy", "internal derangement of the left shoulder."

388.    Despite the prior MRI, Datta referred T.C. specifically to Leading Edge Medical Diagnostic for a second MRI of the lumbar spine.

389.    The report generated by Leading Edge Medical Diagnostic for the lumbar spine MRI that was performed on April 28, 2014, described acromioclavicular arthritis with associated impingement and degenerative tendinosis of the supraspinatus without tearing and mild biceps tenosynovitis.

390.    A MRI of the thoracic spine, which was performed on the same date, reportedly showed evidence of disc desiccation consistent with degenerative disc disease at multiple levels, with no herniation nor posttraumatic abnormality.

391.    In light of these findings, T.C. initiated chiropractic care with Adjust For Life Chiropractic as well as physical therapy with Dassa Orthopedic Medical Services.

392.    T.C. was referred to Dassa by Datta, over 14 months after the subject loss.

393.    As a result of the initial examination with Dassa, T.C. was diagnosed with sprains and strains and multiligamentous injury to the cervical and lumbar spine as well as a left shoulder impingement with rotator cuff tendinosis.

394.    Dassa recommended that T.C. undergo additional physical therapy, chiropractic care, a MRI of the cervical spine and lumbar spine, and a lumbar spine brace.

395.    T.C. subsequently underwent 63 chiropractic sessions through January 30, 2015 and 93 dates of physical therapy sessions through June 5, 2015.

396.    On May 23, 2014, T.C. underwent a repeat MRI of the lumbar spine at Leading Edge Medical Diagnostic.

397.    The report generated by Leading Edge Medical Diagnostic in connection with the lumbar spine MRI described herniations at multiple levels with "multilevel interspace narrowing and dehydration" as well as a bulging disc.

398.    These findings are notably entirely inconsistent from the lumbar spine MRI that was performed on April 28, 2014 at Leading Edge Medical Diagnostic, as well as the initial lumbar spine MRI that was performed on June 11, 2013, which was described as "unremarkable."

399.    On June 9, 2014, T.C. presented at Garden State Neuro Stimulation, where plans for electrodiagnostic studies of the lower extremity were made.

400.    T.C. ultimately continued to treat with the PC Defendants through March 25, 2016, which included epidural injections at five (5) different levels by Datta on September 24, 2014, and a lumbar discogram at four (4) levels, which was performed by Dassa on February 11, 2015.

401.    With regard to medical necessity, the patient's complaint of neck, back, and left trapezius/shoulder pain and subsequent findings on the date of loss suggest relatively soft tissue injuries consistent with sprains that would generally recover within a few weeks.

402.    T.C. medical records indicate that the patient was improving and the lower back symptoms were resolving as of late March and mid-April 2013.

403.    The patient was further noted to have improved neck and shoulder girdle pain before the patient began treating with Datta over a year after the reported motor vehicle accident.

404.    The excessive and concomitant treatment with both physical therapy and chiropractic care is therefore medically unnecessary.

405.    Further, the epidural injection and lumbar decompression for likely a chronic degenerative pathology are medically unnecessary and would have no relation to the motor vehicle accident.

406.    In connection with the treatment that was purportedly rendered to the patient, T.C., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Adjust For Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate,

through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to T.C.

407.    The documentation submitted to Allstate by the defendants demonstrated that T.C. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

### f.    Patient G.L. (Claim No. 0322862979)

408.    The patient G.L. (Claim No. 0322862979) was reportedly involved in a motor vehicle accident on April 14, 2014.

409.    G.L. was subsequently evaluated at the emergency room of St. Luke's Cornwall Hospital wherein the patient had complaints of neck, knee, and axilla pain as well as headaches.

410.    The initial examination revealed that (1) G.L. had a full range of motion and was "normal appearing," with no deformity, edema, or ecchymosis; (2) G.L.'s knee had no effusion and his neurologic examination was grossly intact for motor and sensory function; and (3) G.L.'s cervical spine, pelvis, and right knee x-rays were negative for fracture.

411.    At the conclusion of the examination, G.L. was given a nonspecific diagnosis of "musculoskeletal pain" and was prescribed ibuprofen.

412.    On April 16, 2014, only two (2) days after the reported motor vehicle accident, G.L. presented at Adjust For Life Chiropractic wherein he initiated treatment with Kaloz.

413.    The chiropractic treatment that was recommended by Kaloz would subsequently span 59 sessions through July 13, 2015.

414.    Only one (1) week after the initial chiropractic date of service, G.L. began a concomitant course of physical therapy treatment at Dassa Orthopedic Medical Services. This physical therapy treatment ultimately spanned 92 separate dates of service through July 13, 2015.

415.    On April 21, 2014, only one (1) week after the subject loss, G.L. initiated care with Garden State Neuro Stimulation, where a new patient evaluation was performed.

416.    Despite this evaluation, there is no history described for the patient nor localized symptoms reported.

417.    Rather, the patient was provided with a differential diagnoses including "multiligamentous injury" for the cervical spine, thoracic spine, and lumbar spine, with a nonspecific knee internal derangement.

418.    Moreover, despite being only one (1) week post loss, a lumbosacral orthosis was ordered and G.L. was referred for MRI studies of the cervical spine, thoracic spine, lumbar spine, and right knee.

419.    On April 23, 2014, only nine (9) days after the reported motor vehicle accident, G.L. underwent a MRI of the right knee at Leading Edge Medical Diagnostic.

420.    The report generated by Leading Edge Medical Diagnostic in connection with the MRI showed a posterior horn medial meniscus tear.

421.    On the same date, G.L. underwent a MRI of the thoracic spine, which was reported to be unremarkable.

422.    On May 7, 2014, G.L. returned to Leading Edge Medical Diagnostic wherein MRI studies of the cervical spine and lumbar spine were performed.

423.    The report that was generated in connection with the MRI of the cervical spine showed a "centrally bulging disc" at C4-5 with "slight spinal stenosis".

424.    The report that was generated in connection with the MRI of the lumbar spine showed a "broad bulging disc at L5-S1," with no report of central or foraminal stenosis, nor evidence of posttraumatic pathology.

425.    On May 13, 2014, G.L. initiated orthopedic care with Dassa wherein an initial examination was performed.

426.    Dassa provided multiple impressions, including right knee meniscus tear, cervical and lumbar radiculopathy, and "rule out disc herniation cervical and lumbar spine," despite MRI studies that had already been performed and did not show disc herniations.

427.    As a result of the evaluation, Dassa recommended a lumbar and right knee support, recommended that G.L. continue the course of physical therapy, and cautioned that surgical treatment might be required – despite this evaluation-taking place less than one (1) month after the subject loss.

428.    During a follow-up evaluation only two weeks later on May 27, 2014, Dassa recommended that G.L. undergo a right knee arthroscopic surgery, as G.L. had reportedly failed a course of non-operative therapy.

429.    The arthroscopic surgery was subsequently performed on June 4, 2014, less than two (2) months after the reported motor vehicle accident.

430.    Throughout G.L.'s course of treatment, Dassa regularly recommended that G.L. continue the concomitant course of chiropractic care and physical therapy treatment as well as follow up with pain management.

431.    G.L. ultimately followed this recommendation and sought treatment at Garden State Neuro Stimulation, wherein electrodiagnostic studies were recommended and subsequently performed by Datta.

432.    With regard to medical necessity, the patient's complaints of neck, knee, and axilla pain as well as headaches and subsequent findings on the date of loss were/are insufficient to

support diagnostic imaging and suggest relatively soft tissue injuries consistent with sprains or strains of the neck and back as well as a contusion to the knee.

433.    These sprain, strains, and contusion would be self-limited and would generally recover within days to weeks.

434.    These self-limited soft tissue injuries would have been most reasonably treated with a short course of physical therapy or chiropractic care.

435.    The excessive and concomitant physical therapy and chiropractic care is therefore medically unnecessary.

436.    Likewise, the referral for MRI studies only one (1) week after the subject loss is inappropriate, as the patient had not received sufficient time for the resolution of the likely soft tissue sprains or strains.

437.    The provision of durable medical equipment this early in the course of treatment would further not be supported as medically necessary.

438.    As the medical records, including Dassa's, indicate that the patient allegedly struck his knee on the dashboard, a contusion would be consistent with the mechanism of injury.

439.    Such a mechanism does not cause a meniscus tear as reflected in the Leading Edge Medical Diagnostic and Dassa Orthopedic Medical Services records.

440.    Accordingly, and in light of the full range of motion that was reported on the date of the loss in the emergency room, the right knee arthroscopic procedure cannot be justified as medically necessary nor related to the reported motor vehicle accident.

441.     In connection with the treatment that was purportedly rendered to the patient, G.L., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Adjust For Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate,

through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to G.L.

442. The documentation submitted to Allstate by the defendants demonstrated that G.L. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

### g. Patient R.C. (Claim No. 0324086040)

443. The patient R.C. (Claim No. 0324086040) was reportedly involved in a motor vehicle accident on April 24, 2014.

444. As a result of the reported motor vehicle accident, the patient did not require immediate medical attention.

445. Rather, on April 25, 2014, only one (1) day after the subject loss, R.C. initiated treatment at Adjust For Life Chiropractic.

446. At the time of the initial examination, R.C. reported complaints of neck, back, and right knee pain, with pain radiating to the left hip, thigh, leg, and foot.

447. R.C. was placed on a course of chiropractic care and was referred for MRIs of the neck and back. The recommended course of chiropractic treatment ultimately spanned 43 sessions through March 2, 2015, with an unexplained gap in treatment from August 20, 2014 through March 2, 2015.

448. On April 29, 2014, only five (5) days after the subject loss, R.C. initiated orthopedic care with Dassa through Dassa Orthopedic Medical Services.

449. As a result of the initial examination, Dassa diagnosed R.C. with lumbar radiculopathy and left knee sprain/strain with contusion.

450.    Although R.C. was only five (5) days removed from the reported motor vehicle accident at the time of the initial examination, Dassa referred the patient for a MRI of the right knee and provided the patient with right knee and lumbar supports, a transcutaneous electrical nerve stimulation ("TENS") unit, and Terocin patches.

451.    On May 7, 2014, less than two (2) weeks after the reported motor vehicle accident, R.C. underwent a MRI of the cervical spine at Leading Edge Medical Diagnostic.

452.    The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI showed a "huge central and right paracentral disc herniation" at C6-C7 with severe compression on the spinal cord and right sided foraminal narrowing.

453.    The report further noted that there was caudal migration of the disc fragment to the mid C7 vertebra; a large disc herniation/ridge complex compressing the anterior spinal cord at C5-6; a cephalad migration of the disc fragment to the level of C5; central and right paracentral herniation at C4-5 with bilateral foraminal narrowing; a central disc bulge at C3-4 with bilateral foraminal narrowing; and bilateral foraminal narrowing at C7-T1.

454.    On the same date, R.C. underwent a MRI of the right knee, wherein it was reported that the study showed a "full thickness acute tear of the posterior horn of the lateral meniscus" as well as an "oblique tear of the posterior horn of the medial meniscus with intramensical fluid suggesting an acute/subacute process".

455.    On May 27, 2014, R.C. returned to Leading Edge Medical Diagnostic where a MRI of the lumbar spine was performed.

456.    The report for the MRI of the lumbar spine noted that the study showed a central and right paracentral disc herniation at L4-5 and a central and left paracentral disc herniation at L5-S1.

457.    The report further noted bilateral foraminal narrowing at all levels from L2 through S1; disc bulging at L1-2, L2-3, and L3-4; and bilateral facet arthropathy at L4-5 and L5-S1 with spinal stenosis.

458.    On June 24, 2014, R.C. returned for an orthopedic evaluation with Dassa.

459.    In light of the purported MRI findings, Dassa offered surgical treatment, which R.C. declined due to his fear of surgical treatment and his unrelated medical conditions.

460.    Accordingly, Dassa recommended that R.C. continue physical therapy and referred R.C. to Datta for pain management.

461.    R.C. was subsequently evaluated by Datta who diagnosed R.C. with "multiligamentous injury" of the cervical spine, thoracic spine, and lumbar spine; differential diagnoses of herniated discs for the cervical spine and lumbar spine; cervical spine and lumbar spine radiculopathy; and a nonspecific diagnosis of right knee "internal derangement."

462.    As a result of these diagnoses, Datta recommended electrodiagnostic studies of both the upper and lower extremities, which were later performed on July 28, 2014.

463.    At the conclusion of the reevaluation and electrodiagnostic testing on July 28, 2014, Datta proposed a percutaneous lumbar discectomy, as he reported that the patient was "desirous of a surgical option."

464.    The medical records indicate that the proposed percutaneous lumbar discectomy was performed on September 2, 2014, with charges exceeding $200,000.00.

465.    Notably, the patient's subsequent records do not indicate sustained relief as a result of this procedure.

466.    With regard to medical necessity, the patient's complaint neck, back, and right knee pain one day after the date of loss were/are insufficient to support diagnostic imaging and suggest

relatively soft tissue injuries consistent with sprains of the neck and back with contusions to the right knee and right hand.

467.    The patient's injuries were sufficiently minor to nor require immediate emergency care on the date of the loss.

468.    The chiropractic evaluation that was performed the following day and the initial examination performed by Dassa only five (5) days later indicated that the testing was negative for radiculopathy and did not describe any extremity radicular symptoms.

469.    The mechanism of injury for the knee and hand were noted to be consistent with a contusion from R.C. striking something in the vehicle.

470.    Accordingly, a short course of physical therapy or chiropractic care would have been reasonable for these soft tissue injuries.

471.    The excessive concomitant physical therapy and chiropractic care is therefore medically unnecessary.

472.    Similarly, the referral for MRI studies within days of the reported motor vehicle accident is inappropriate, as the studies were ordered before the natural history would have allowed resolution of soft tissue injuries and before a course of conservative care could be completed.

473.    Likewise, the prescription for durable medical equipment this early in treatment is not medically necessary.

474.    As R.C.'s vehicle was allegedly rear-ended, the mechanism of being rear-ended would not be expected to cause a meniscus tear in the knee, nor do the records indicate that the patient had any symptoms consistent with meniscal pathology.

475.    In light of the lack of radicular complaints, the reports of no numbness or tingling, and the lack of imaging demonstrating neurocompressive findings, the percutaneous lumbar

discectomy performed on September 2, 2014 is medically unnecessary and not related to the reported motor vehicle accident.

476.    In connection with the treatment that was purportedly rendered to the patient, R.C., the defendants, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Adjust For Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate, through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to R.C.

477.    The documentation submitted to Allstate by the defendants demonstrated that R.C. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

### h.    Patient D.F. (Claim No. 0408094506)

478.    The patient D.F. (Claim No. 0408094506) was reportedly involved in a motor vehicle accident on March 30, 2016.

479.    D.F. was transported from the scene of the reported motor vehicle accident to the hospital by ambulance for further evaluation.

480.    Upon arriving at the St. Luke's Cornwall Hospital emergency room, D.F. had complaints of left sided neck, shoulder, and arm pain and denied a loss of consciousness and head trauma.

481.    The patient's medical records indicate a history of cervical spine issues and a history of a previous anterior cervical discectomy and fusion from C5 through C7.

482.    Notably, D.F. denied any back pain and joint pain apart from reporting symptoms at the left shoulder and arm.

483.    An evaluation at the St. Luke's Hospital emergency room revealed a full range of motion of the extremities, which were described as "normal appearing" with no deformity, edema, or ecchymosis.

484.    The patient's neurologic examination demonstrated motor and sensory functions to be grossly intact, with radiographs of the cervical spine revealing no fracture.

485.    Further, radiographs of the left shoulder were further negative with no evidence no facture fracture or dislocation.

486.    At the conclusion of the evaluation, D.F. was diagnosed with "neck pain" and was discharged from the hospital.

487.    On April 7, 2016, only eight (8) days after the reported motor vehicle accident, D.F. sought treatment with Kaloz at Adjust For Life Chiropractic.

488.    Although D.F. denied back pain and made no mention of knee pain in the emergency room on the date of loss, Kaloz noted injuries to the patient's neck, middle back, lower back, left upper extremity, and both knees.

489.    In light of these purported injuries, Kaloz recommended that D.F. undergo a course of chiropractic treatment.

490.    This treatment ultimately spanned 115 chiropractic visits extending through March 30, 2017.

491.    On April 12, 2016, D.F. initiated orthopedic care with Dassa at Dassa Orthopedic Medical Services.

492.    Akin to that of Kaloz, Dassa reported complaints of pain in the cervical spine and lumbar spine despite no record of pain being reported at the emergency room.

493.    Moreover, Dassa reported a complaint of pain in the left shoulder, and for the first time, documented a complaint of pain in the right elbow.

494.    At the conclusion of the initial examination, Dassa diagnosed D.F. with sprains and strains and multiligamentous injury to the cervical and lumbar spine, as well as a left shoulder impingement and right elbow lateral epicondylitis.

495.    In light of these injuries, Dassa recommended both physical therapy and chiropractic care and prescribed a lumbar brace, Motrin, Flexeril, and the compounded pain cream, Terocin.

496.    Despite being only thirteen (13) days removed from the reported motor vehicle accident, Dassa referred D.F. for MRI studies of both the left shoulder and the right elbow.

497.    D.F. subsequently began a course of physical therapy treatment at Dassa Orthopedic Medical Services on April 12, 2016, which ultimately spanned 47 dates of service through May 30, 2016.

498.    On April 25, 2016, less than one (1) month after the subject loss, D.F. underwent MRI studies of the left shoulder and right elbow at Leading Edge Medical Diagnostic.

499.    The report generated by Leading Edge Medical Diagnostic in connection with the left shoulder MRI revealed acromioclavicular arthritis with associated impingement as well as degenerative tendinosis of the supraspinatus.

500.    There was no report of a rotator cuff tear, labral tear, or abnormality of the biceps, which was found to be unremarkable.  Further, there was no significant joint effusion.

501.    With regard to the right elbow, the report generated by Leading Edge Medical Diagnostic showed degenerative tendinopathy of the triceps tendon, with no report of an abnormality at the exterior carpi radialis brevis to suggest a diagnosis of lateral epicondylitis.

502.    After treating with a separate pain management physician, D.F. returned to Dassa for a revaluation on August 24, 2016.

503.    At that time, Dassa reported that the patient had pain when raising the left shoulder and indicated that the impingement sign was reported as positive.

504.    Without documenting its location, Dassa performed a corticosteroid injection to the left shoulder and prescribed the patient with Terocin compounded pain cream.

505.    Dassa further recommended further physical therapy, wherein an additional 131 physical therapy visits were noted between August 25, 2016 and January 23, 2018.

506.    In subsequent revaluations, Dassa diagnosed the patient with left shoulder impingement syndrome with rotator cuff tendinosis and later a new diagnosis of rotator cuff tear, despite the prior MRI study, which showed no evidence of a rotator cuff tear.

507.    D.F. ultimately underwent a left shoulder arthroscopic procedure that was performed by Dassa on March 20, 2017.

508.    With regard to medical necessity, the patient's complaint of left sided neck, shoulder, and arm pain and subsequent findings on the date of loss were/are insufficient to support diagnostic imaging and suggest relatively minor soft tissue injuries consistent with sprains/strains, which generally recover within days to a few weeks.

509.    Such soft tissue sprain/strains are typically managed with a short course of anti-inflammatory medication, short-term muscle relaxant and/or acetaminophen.

510.    Compounded pain creams are not generally supported by evidence based medicine and the use of Terocin would not be recommended as medically necessary.

511.    Further, a short course of physical therapy or chiropractic are would be reasonable.

512.    The concomitant extensive physical therapy and chiropractic care cannot be justified as medically necessary.

513.    Moreover, the referral for MRI studies is further inappropriate, as the studies were ordered before the patient had received sufficient conservative care and before the soft tissue injuries could have naturally recovered.

514.    As an impingement would not be expected to be caused by a motor vehicle accident with this mechanism of injury, and as the MRI study did not show posttraumatic findings but rather degenerative tendinosis of the rotator cuff, the left shoulder arthroscopic procedure cannot be justified as medically necessary nor related to the reported motor vehicle accident.

515.    In connection with the treatment that was purportedly rendered to the patient, D.F., the defendants, Dassa Orthopedic Medical Services, Adjust For Life Chiropractic, and Leading Edge Medical Diagnostic, submitted documentation to Allstate, through the U.S. mail, supporting their demand for No-Fault reimbursement in connection with the services provided to D.F.

516.    The documentation submitted to Allstate by the defendants demonstrated that D.F. received excessive, prolonged, and medically unnecessary healthcare services from the PC Defendants during the relevant period.

## 2.    <u>Leading Edge Medical Diagnostic's Treatment Protocol</u>

517.    The MRI reports generated by Leading Edge Medical Diagnostic and submitted to Allstate in support of Leading Edge Medical Diagnostic's demands for reimbursement under New York's No-Fault laws are false and fraudulent because the findings expressed therein materially misrepresent what is expressed on the corresponding images.

518.    In some cases, Leading Edge Medical Diagnostic's MRI reports misrepresent the patients' conditions because they describe findings that are more severe than what is actually reflected in the corresponding image.

519.    In other cases, Leading Edge Medical Diagnostic's MRI reports deliberately misrepresent the patients' conditions because they describe findings that are not at all supported by the corresponding image.

520.    Additionally, in certain instances, Leading Edge Medical Diagnostic's MRI reports actually fail to include conditions that are present in the corresponding image.

521.    Overall, the defendants have caused Leading Edge Medical Diagnostic to purposely misrepresent to Allstate the true nature of the patients' actual injuries, if any.

522.    In doing so, Leading Edge Medical Diagnostic sought—and in some instances received—reimbursement for radiological services that were false and fraudulent.

523.    The following examples serve to demonstrate, with particularity, how the defendants' MRI reports materially misrepresent the actual condition of Leading Edge Medical Diagnostic's patients.

### a.    Patient P.V. (Claim No. 0554335273)

524.    Patient P.V. (Claim No. 0554335273) underwent a MRI of the right knee at Leading Edge Medical Diagnostic on August 20, 2019.

525.    Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to P.V.

526.    The report generated by Leading Edge Medical Diagnostic in connection with the right knee MRI described, among other things, an oblique tear of the posterior horn medial

meniscus, a non-specific oblique signal of the anterior horn medial meniscus, horizontal tears of the anterior horn and posterior horn lateral meniscus, small medial and lateral effusions, fluid in the prepatellar and suprapatella bursae, and mild adventitial bursitis medially.

527.    If true, the report for P.V.'s MRI of the right knee reflects significant injuries that would possibly warrant further medical intervention.

528.    However, the findings reported for P.V. are inaccurate, as the images of P.V.'s right knee were within normal limits with no meniscal tear depicted.

529.    Although the images reflected a mild increased signal in the posterior horn of the lateral meniscus, which did not extend to the articular surface and likely representing a degenerative intrameniscal signal, a definite tear is not identified.  Further, the amount of fluid within the knee joint was minimal and within normal limits, with no evidence of bursitis.

530.    On September 23, 2019, P.V. returned to Leading Edge Medical Diagnostic and underwent a MRI of the cervical spine.

531.    The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described, among other things, a C3-4 central disc bulge with bilateral neural foraminal narrowing, C4-5 subligamentous central disc herniation with relative bilateral neural foraminal narrowing, and C5-6 central and right paracentral disc herniation with bilateral foraminal narrowing.

532.    If true, the report for P.V.'s MRI of the cervical spine reflects significant injuries that would possibly warrant further medical intervention.

533.    However, like the report of P.V.'s right knee, the findings report for P.V.'s cervical spine are inaccurate, as the study shows only a small central disc herniation at C4-5.

534.    The images do not support the finding of a disc herniation at C5-6 as stated in the Leading Edge Medical Diagnostic report, and the remainder of the examination was unremarkable.

535.    As such, the August 20, 2019 report for the MRI of P.V.'s right knee and the September 23, 2019 report for the MRI of P.V.'s cervical spine are false, fraudulent, and consistent with the trend of exaggerated diagnoses and false positive reporting.

### b.    Patient A.G. (Claim No. 0553239534)

536.    Patient A.G. (Claim No. 0553239534) underwent MRI studies of the cervical spine and lumbar spine at Leading Edge Medical Diagnostic on August 27, 2019.

537.    Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to A.G.

538.    The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described, among other things, anterior spurs present involving the C5 and C6 vertebrae, C4-5 right paracentral disc bulge, C5-C6 shallow right lateral disc herniation, and C6-7 central disc bulge.

539.    Further, the report generated by Leading Edge Medical Diagnostic in connection with the lumbar spine MRI described, among other things, muscular spasm, L2-3 right lateral disc bulge, L3-4 right paracentral disc bulge with right neural foraminal narrowing, L4-5 broad-based disc bulge with bilateral neural foraminal narrowing, and L5-S1 right paracentral disc bulge.

540.    If true, the reports for A.G.'s MRIs of the cervical spine lumbar spine reflect significant injuries that would possibly warrant further medical intervention.

541.    However, the findings reported for A.G.'s cervical spine MRI are inaccurate, as the examination was within normal limits with no evidence of any disc herniation nor annular bulging.

542. The Leading Edge Medical Diagnostic report overstated the significance of the findings at the C5-6 level and incorrectly reported a disc herniation.

543. Likewise, the findings reported for A.G.'s lumbar spine are specious, as the study shows minimal physiological bulging of the L4-5 and L5-S1 discs that are within normal limits.

544. The study indicates that there is no significant neural foraminal narrowing present on the examination, with only minimal bulging at the L2-3 and L5-S1 levels.

545. Accordingly, the August 27, 2019 reports for the MRIs of A.G.'s cervical spine and lumbar spine are false, fraudulent, and consistent with the trend of exaggerated diagnoses and false positive reporting.

### c.    Patient A.B. (Claim No. 0567539431)

546. Patient A.B. (Claim No. 0567539431) underwent a MRI of the right knee at Leading Edge Medical Diagnostic on August 26, 2019.

547. Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to A.B.

548. The report generated by Leading Edge Medical Diagnostic in connection with the right knee MRI described, among other things, an oblique tear of the posterior horn of the medial meniscus, an oblique signal in the anterior horn of the medical meniscus, a nonspecific horizontal signal in the anterior horn of the lateral meniscus, an oblique tear in the posterior horn of the lateral meniscus, patellar tendinosis, small popliteal cyst, and a small lateral effusion.

549. If true, the report for A.B.'s MRI of the right knee reflects significant injuries that would possibly warrant further medical intervention.

550.    However, the findings reflected for A.B.'s right knee MRI are inaccurate, as there are no significant abnormalities on the examination.

551.    The study reflects a mild degenerative intrameniscal signal in the posterior horn of the medical meniscus without a definite tear.

552.    Further, the later meniscus appears intact and there is no significant joint effusion.

553.    The fluid within the knee joint is within normal limits, as is the remainder of the examination.

554.    Accordingly, the August 26, 2019 report for the MRI of A.B.'s right knee is false, fraudulent, and consistent with the trend of exaggerated diagnoses and false positive reporting.

### d.    Patient C.G. (Claim No. 0555259950)

555.    Patient C.G. (Claim No. 055259950) underwent a MRI of the cervical spine at Leading Edge Medical Diagnostic on September 10, 2019.

556.    Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to C.G.

557.    The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described, among other things, muscular spasm, mid-to-lower cervical spondylosis, multilevel interspace narrowing and dehydration, C2-43 bulging annulus, C3-4 broad-based disc bulge with a right focal component with bilateral neural foraminal narrowing, C4-5 broad-based disc herniation, C5-6 broad-based disc herniation with superimposed left lateral component effacing the anterior subarachnoid space with bilateral neural foraminal and compression on the exiting nerve roots bilaterally, C6-7 central and left lateral disc herniations effacing the anterior subarachnoid space with severe bilateral neural foraminal narrowing, and C7-

T1 broad-based disc bulge partially effacing the anterior subarachnoid space with bilateral neural foraminal narrowing and compression of the exiting nerve roots bilaterally.

558.    If true, the report for C.G.'s MRI of the cervical spine reflects significant injuries that would possibly warrant further medical intervention.

559.    However, the findings reflected for C.G.'s cervical spine MRI are inaccurate, as the study shows only a broad-based disc herniation at C5-6 and a small disc herniation at C6-7.

560.    The study does not reflect a disc herniation at C4-5 and straightening of the cervical spine is likely due to the patient's positioning and not muscle spasm.

561.    Despite the report of disc herniations at C5-6 and C6-7, the study reflects degenerative disc disease with disc space narrowing and spondylosis present.

562.    Accordingly, the September 10, 2019 report for the MRI of C.G.'s cervical spine is false, fraudulent, and consistent with the trend of exaggerated diagnoses and false positive reporting.

### e.    Patient L.V. (Claim No. 055570209)

563.    Patient L.V. (Claim No. 055570209) underwent MRI studies of the left knee and left shoulder at Leading Edge Medical Diagnostic on September 7, 2019.

564.    Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to L.V.

565.    The report generated by Leading Edge Medical Diagnostic in connection with the left knee MRI described, among other things, oblique tears of the anterior horn and posterior horn of the lateral meniscus, acute oblique tears of the anterior horn and posterior horn of the medial

meniscus, patellar tendinosis, sprain/strain of the medial collateral ligament, small lateral effusion, and prepatellar fluid.

566.    Moreover, the report generated by Leading Edge Medical Diagnostic in connection with the left shoulder MRI described, among other things, bicipital tenosynovitis and a likely SLAP tear.

567.    If true, the reports for L.V.'s left knee and left shoulder MRIs reflect significant injuries that would possibly warrant further medical intervention.

568.    However, the findings reflected for L.V.'s left knee MRI are inaccurate, as the study reflects a mild grade two (2) signal in the posterior horn of the medial meniscus without a focal tear.

569.    The study indicates that the lateral meniscus is intact with no evidence of lateral meniscal tears.

570.    Further, the collateral ligaments appear normal with a normal amount of fluid in the knee joint.

571.    In addition, the findings reflected for L.V.'s left shoulder are incorrect, as there is no evidence of a SLAP tear on examination.

572.    The study reflects a normal glenoid labrum, with a normal amount of fluid in the shoulder joint and bicep tendon sheath.

573.    Accordingly, the September 7, 2019 reports for the MRIs of L.V.'s left knee and left shoulder are false, fraudulent, and consistent with the exaggerated diagnoses and false positive reporting.

**f.**     **Patient M.V. (Claim No. 055570209)**

574.     Patient M.V. (Claim No. 055570209) under MRI studies of the right knee and left shoulder at Leading Edge Medical Diagnostic on February 6, 2020.

575.     Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to M.V.

576.     The report generated by Leading Edge Medical Diagnostic in connection with the right knee MRI described, among other things, multi-compartment joint space narrowing with productive change, an acute oblique tear of the posterior horn medial meniscus, an oblique tear of the anterior horn medical meniscus, an oblique tear of the posterior horn meniscus, a horizontal signal of the anterior horn lateral meniscus, patellar tendinosis, periligamentous edema of the medial collateral ligament, sprain/strain of the lateral collateral ligament, bone infarcts involving proximal tibia, marrow edema distal lateral femoral condyle consistent with bone bruise/contusion, prepatellar and suprapatellar fluid, and a lateral effusion.

577.     Further, the report generated by Leading Edge Medical Diagnostic in connection with the left shoulder MRI described, among other things, productive changes in the acromioclavicular joint, subchondral/osteochondral changes to the superolateral humeral head, a tear of the supraspinatus muscle and tendon complex consistent with a rotator cuff tear, fluid in the glenohumeral joint with a possible labral SLAP tear, subglenoid effusion, and biceps tenosynovitis.

578.     If true, the reports for M.V.'s right knee and left shoulder MRIs reflect significant injuries that would possibly warrant further medical intervention.

579.    However, the findings reflected for M.V.'s right knee are inaccurate, as the study indicates only narrowing of the joint compartment medially and laterally with osteophytic change and a tear of the medial meniscus.

580.    The anterior horn of the lateral meniscus is not well demonstrated and there is motion artifact on the examination, which limited the interpretation of the study.

581.    The study further reflects that the collateral ligaments appear intact, with a normal amount of fluid within the knee joint and degenerative changes in the lateral tibial plateau.

582.    The remainder of the examination shows no acute abnormalities.

583.    Further, the findings reflected for M.V.'s left shoulder are deceptive, as the supraspinatus tendon appears intact.

584.    Although there is tendinosis present, there is no definite supraspinatus tendon tear.

585.    Moreover, although there are mild hypertrophic changes in the AC joint, the changes in the humeral head are degenerative.

586.    There is no evidence of a SLAP tear and the fluid in the shoulder joint and surrounding bursae are within normal limits, with the remainder of the examination being unremarkable.

587.    Accordingly, the September 7, 2019 reports for the MRIs of M.V.'s right knee and left shoulder are false, fraudulent, and consistent with the exaggerated diagnoses and false positive reporting.

### g.    Patient R.R. (Claim No. 0562904730)

588.    Patient R.R. (Claim No. 0562904730) underwent a MRI of the cervical spine at Leading Edge Medical Diagnostic on November 5, 2019.

589.    Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to R.R.

590.    The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described, among other things, multilevel interspace narrowing and dehydration, C3-C4 broad-based disc bulge effacing the anterior subarachnoid space with right neural foraminal narrowing, C5-6 broad-based and left paracentral disc herniation with bilateral neural foraminal narrowing, and C6-7 bulging annulus.

591.    If true, the report for R.R.'s cervical spine MRI reflects significant injuries that would possibly warrant further medical intervention.

592.    However, the findings reflected for R.R.'s cervical spine are inaccurate, as the examination was within normal limits.

593.    The study contains no evidence of significant annular bulging nor a C5-6 disc herniation.

594.    Rather, the study reflects only mild neural foraminal narrowing bilaterally.

595.    On February 1, 2020, R.R. returned to Leading Edge Medical Diagnostic and underwent a MRI of the lumbar spine.

596.    The report generated by Leading Edge Medical Diagnostic in connection with the lumbar spine MRI described, among other things, interspace narrowing and dehydration at L4-5 and L5-S1, L3-L4 broad-based disc bulge with left neural foraminal narrowing and bilateral facet hypertrophy, L4-L5 broad-based disc herniation with bilateral neural foraminal narrowing/lateral recess stenosis, bilateral facet hypertrophy, spinal stenosis and compression on the exiting nerve roots bilaterally, and L5-S1 central disc herniation with bilateral neural foraminal

narrowing/lateral recess stenosis, bilateral facet hypertrophy, spinal stenosis, and compression of the exiting nerve roots bilaterally.

597.     However, like that of the cervical spine, the findings reflected for R.R.'s lumbar spine are inaccurate, as the L1-2, L2-3, and L3-4 levels appear normal.

598.     The study reflects only a mild facet arthropathy and broad annular bulge without a focal herniation at the L4-5 level and a bilateral fact arthropathy and annular bulge without a focal herniation at the L5-S1 level.

599.     Accordingly, the November 5, 2019 report for the MRI of R.R.'s cervical spine and the February 1, 2020 report for the MRI of R.R.'s lumbar spine are false, fraudulent, and consistent with the exaggerated diagnoses and false positive reporting.

**h.     Patient Y.C. (Claim No. 0555824135)**

600.     Patient Y.C. (Claim No. 0555824135) underwent MRI studies of the lumbar spine and cervical spine at Leading Edge Medical Diagnostic on September 16, 2019.

601.     Thereafter, using the U.S. Mail, the defendants, through Leading Edge Medical Diagnostic, submitted to Allstate documentation supporting Leading Edge Medical Diagnostic's demand for No-Fault reimbursement in connection with the services provided to Y.C.

602.     The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described, among other things, slight retrolisthesis of L3 relative to L4 and of L4 relative to L5, multilevel interspace narrowing and dehydration, L1-L2 right paracentral disc bulge, L2-L3 right paracentral disc herniation with right neural foraminal narrowing/right lateral recess stenosis and bilateral facet hypertrophy, L3-L4 lateral disc bulge with bilateral neural foraminal narrowing/lateral recess stenosis and bilateral facet hypertrophy, L4-L5 broad-based disc bulge with bilateral neural foraminal narrowing/lateral recess stenosis, bilateral facet

hypertrophy and compression on the exiting roots bilaterally, and L5-S1 central disc bulge with bilateral neural foraminal narrowing/lateral recess stenosis, right greater than left, and associated bilateral hypertrophy.

603.    The report generated by Leading Edge Medical Diagnostic in connection with the cervical spine MRI described, among other things, multilevel interspace narrowing and dehydration, C3-C4 central and right paracentral disc bulge with right neural foraminal narrowing, C4-5 central disc herniation superimposed on a broad-based disc herniation with bilateral neural foraminal narrowing, C5-C6 central and right paracentral disc herniation with right neural foraminal narrowing, and C6-C7 broad-based disc bulge.

604.    If true, the reports for Y.C.'s cervical spine and lumbar spine MRIs reflect significant injuries that would possibly warrant further medical intervention.

605.    However, the findings reflected for Y.C.'s lumbar spine are inaccurate, as the study shows no evidence of disc herniation at the L1-2 and L2-3 levels.

606.    Rather, the study shows only evidence of mild facet arthropathy at the L2-3 level, facet arthropathy at the L3-4 level, bilateral facet arthropathy and grade one (1) anterolisthesis at the L4-5 level, and bilateral facet arthropathy and a minimal annular bulge at the L5-S1 level.

607.    Likewise, the findings reflected for Y.C.'s cervical spine are imprecise, as the C2-3 and C3-4 levels are unremarkable.

608.    The study reflects only a tiny central disc protrusion without a definite disc herniation at the C4-5 level while the C6-7 and C7-T1 levels appear normal, in direct contrast to the Leading Edge Medical Diagnostic report.

609.     Accordingly, the September 16, 2019 reports for Y.C.'s cervical spine and lumbar spine MRIs are false, fraudulent, and consistent with the exaggerated diagnoses and false positive reporting.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

610.     Throughout the course of this entire scheme, Kostanian, Denevich, Dassa, Datta, Kaloz, Shubina, Schlusselberg, and Khodak, working through the PC Defendants, Skazka, and/or Nimble Business Solutions (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

611.     Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters and requests for payments in connection with the insurance claims reference throughout this pleading traveled through the U.S. Mail.

612.     Every automobile insurance claim detailed within, involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

A.  **DASSA ORTHOPEDIC MEDICAL SERVICES ENTERPRISE**

613.    Dassa, Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Dassa Orthopedic Medical Services to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

614.    Dassa, Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Dassa Orthopedic Medical Services to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Dassa Orthopedic Medical Services mailed a demand for payment (i.e., invoice) to Allstate.

615.    Kostanian's, Denevich's, and Khodak's management and control of Dassa Orthopedic Medical Services, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Dassa Orthopedic Medical Services' professional physician fees and profits, rendered Dassa Orthopedic Medical Services completely ineligible for No-Fault reimbursement under New York law.

616.    Because Dassa Orthopedic Medical Services was, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (non-physicians), Dassa, Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions purposely caused Dassa Orthopedic Medical Services to make a misrepresentation each and every time that Dassa Orthopedic Medical Services mailed a document to Allstate claiming eligibility for reimbursement.

617.    Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully controlled Dassa Orthopedic Medical Services, (b) Dassa, Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Dassa Orthopedic Medical Services to seek No-Fault

reimbursement from Allstate (even though Dassa Orthopedic Medical Services was not entitled to such reimbursement), and (c) Dassa Orthopedic Medical Services used the U.S. Mail to seek reimbursement, it is clear that Dassa, Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions committed mail fraud.

618.    At all relevant times, Dassa, Datta, Kostanian, Denevich, and Khodak knew that Dassa Orthopedic Medical Services, Skazka, Nimble Business Solutions, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Dassa Orthopedic Medical Services.

619.    Allstate estimates that the unlawful operation of the Dassa Orthopedic Medical Services enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 1 and incorporated by reference as if set forth in its entirety.

### B.  GARDEN STATE NEURO STIMULATION ENTERPRISE

620.    Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Garden State Neuro Stimulation to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

621.    Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Garden State Neuro Stimulation to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Garden State Neuro Stimulation mailed a demand for payment (i.e., invoice) to Allstate.

622.     Kostanian's, Denevich's, and Khodak's management and control of Garden State Neuro Stimulation, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Garden State Neuro Stimulation's professional physician fees and profits, rendered Garden State Neuro Stimulation completely ineligible for No-Fault reimbursement under New York law.

623.     Because Garden State Neuro Stimulation was, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (non-physicians), Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions purposely caused Garden State Neuro Stimulation to make a misrepresentation each and every time that Garden State Neuro Stimulation mailed a document to Allstate claiming eligibility for reimbursement.

624.     Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully controlled Garden State Neuro Stimulation, (b) Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Garden State Neuro Stimulation to seek No-Fault reimbursement from Allstate (even though Garden State Neuro Stimulation was not entitled to such reimbursement), and (c) Garden State Neuro Stimulation used the U.S. Mail to seek reimbursement, it is clear that Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions committed mail fraud.

625.     At all relevant times, Datta, Kostanian, Denevich, and Khodak knew that Garden State Neuro Stimulation, Skazka, Nimble Business Solutions, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Garden State Neuro Stimulation.

626.     Allstate estimates that the unlawful operation of the Garden State Neuro Stimulation enterprise generated hundreds of mailings. A table highlighting selected examples of

mailings made in furtherance of this scheme is annexed at Exhibit 2 and incorporated by reference as if set forth in its entirety.

### C.    DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER ENTERPRISE

627.    Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Datta Endoscopic Back Surgery & Pain Center to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

628.    Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Datta Endoscopic Back Surgery & Pain Center to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Datta Endoscopic Back Surgery & Pain Center mailed a demand for payment (i.e., invoice) to Allstate.

629.    Kostanian's, Denevich's, and Khodak's management and control of Datta Endoscopic Back Surgery & Pain Center, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Datta Endoscopic Back Surgery & Pain Center's professional physician fees and profits, rendered Datta Endoscopic Back Surgery & Pain Center completely ineligible for No-Fault reimbursement under New York law.

630.    Because Datta Endoscopic Back Surgery & Pain Center was, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (non-physicians), Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions purposely caused Datta Endoscopic Back Surgery & Pain Center to make a misrepresentation each and every time that Datta Endoscopic Back Surgery & Pain Center mailed a document to Allstate claiming eligibility for reimbursement.

631.    Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully controlled Datta Endoscopic Back Surgery & Pain Center, (b) Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Datta Endoscopic Back Surgery & Pain Center to seek No-Fault reimbursement from Allstate (even though Datta Endoscopic Back Surgery & Pain Center was not entitled to such reimbursement), and (c) Datta Endoscopic Back Surgery & Pain Center used the U.S. Mail to seek reimbursement, it is clear that Datta, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions committed mail fraud.

632.    At all relevant times, Datta, Kostanian, Denevich, and Khodak knew that Datta Endoscopic Back Surgery & Pain Center, Skazka, Nimble Business Solutions, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Datta Endoscopic Back Surgery & Pain Center.

633.    Allstate estimates that the unlawful operation of the Datta Endoscopic Back Surgery & Pain Center enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 3 and incorporated by reference as if set forth in its entirety.

### D.    ADJUST FOR LIFE CHIROPRACTIC ENTERPRISE

634.    Kaloz, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Adjust For Life Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

635.     Kaloz, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Adjust For Life Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Adjust For Life Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

636.     Kostanian's, Denevich's, and Khodak's management and control of Adjust For Life Chiropractic, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Adjust For Life Chiropractic's professional physician fees and profits, rendered Adjust For Life Chiropractic completely ineligible for No-Fault reimbursement under New York law.

637.     Because Adjust For Life Chiropractic was, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (non-physicians), Kaloz, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions purposely caused Adjust For Life Chiropractic to make a misrepresentation each and every time that Adjust For Life Chiropractic mailed a document to Allstate claiming eligibility for reimbursement.

638.     Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully controlled Adjust For Life Chiropractic, (b) Kaloz, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Adjust For Life Chiropractic to seek No-Fault reimbursement from Allstate (even though Adjust For Life Chiropractic was not entitled to such reimbursement), and (c) Adjust For Life Chiropractic used the U.S. Mail to seek reimbursement, it is clear that Kaloz, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions committed mail fraud.

639.     At all relevant times, Kaloz, Kostanian, Denevich, and Khodak knew that Adjust For Life Chiropractic, Skazka, Nimble Business Solutions, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in

connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Adjust For Life Chiropractic.

640.     Allstate estimates that the unlawful operation of the Adjust For Life Chiropractic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 4 and incorporated by reference as if set forth in its entirety.

## E.     NEWBURGH PRIMARY CARE ENTERPRISE

641.     Shubina, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions (and/or other persons working at their discretion and/or on their behalf) either used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Newburgh Primary Care to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

642.     Shubina, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Newburgh Primary Care to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Newburgh Primary Care mailed a demand for payment (i.e., invoice) to Allstate.

643.     Kostanian's, Denevich's, and Khodak's management and control of Newburgh Primary Care, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Newburgh Primary Care's professional physician fees and profits, rendered Newburgh Primary Care completely ineligible for No-Fault reimbursement under New York law.

644.     Because Newburgh Primary Care was, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (non-physicians), Shubina, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions purposely caused Newburgh Primary Care to make a misrepresentation

each and every time that Newburgh Primary Care mailed a document to Allstate claiming eligibility for reimbursement.

645.    Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully controlled Newburgh Primary Care, (b) Shubina, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions caused Newburgh Primary Care to seek No-Fault reimbursement from Allstate (even though Newburgh Primary Care was not entitled to such reimbursement), and (c) Newburgh Primary Care used the U.S. Mail to seek reimbursement, it is clear that Shubina, Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions committed mail fraud.

646.    At all relevant times, Shubina, Kostanian, Denevich, and Khodak knew that Newburgh Primary Care, Skazka, Nimble Business Solutions, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Newburgh Primary Care.

647.    Allstate estimates that the unlawful operation of the Newburgh Primary Care enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 5 and incorporated by reference as if set forth in its entirety.

F.    LEADING EDGE MEDICAL DIAGNOSTIC ENTERPRISE

648.    Schlusselberg, Khodak, Dassa, Datta, Kaloz, Shubina, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Pain & Surgery Center, Adjust For Life Chiropractic, and Newburgh Primary Care (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Leading Edge Medical Diagnostic to be mailed

to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

649.     Schlusselberg, Khodak, Dassa, Datta, Kaloz, Shubina, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Pain & Surgery Center, Adjust For Life Chiropractic, and Newburgh Primary Care caused Leading Edge Medical Diagnostic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Leading Edge Medical Diagnostic mailed a demand for payment (i.e., invoice) to Allstate.

650.     Khodak's management and control of Leading Edge Medical Diagnostic, combined with Khodak's unlawful receipt of Leading Edge Medical Diagnostic's professional physician fees and profits, rendered Leading Edge Medical Diagnostic completely ineligible for No-Fault reimbursement under New York law.

651.     Because Leading Edge Medical Diagnostic was, in fact, unlawfully controlled by Khodak (a non-physician), Schlusselberg, Khodak, Dassa, Datta, Kaloz, Shubina, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Pain & Surgery Center, Adjust For Life Chiropractic, and Newburgh Primary Care purposely caused Leading Edge Medical Diagnostic to make a misrepresentation each and every time that Leading Edge Medical Diagnostic mailed a document to Allstate claiming eligibility for reimbursement.

652.     Moreover, because (a) Khodak unlawfully controlled Leading Edge Medical Diagnostic, (b) Schlusselberg, Khodak, Dassa, Datta, Kaloz, Shubina, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Pain & Surgery Center, Adjust For Life Chiropractic, and Newburgh Primary Care caused Leading Edge Medical Diagnostic to seek No-Fault reimbursement from Allstate (even though Leading Edge Medical Diagnostic was

not entitled to such reimbursement), and (c) Leading Edge Medical Diagnostic used the U.S. Mail to seek reimbursement, it is clear that Schlusselberg, Khodak, Dassa, Datta, Kaloz, Shubina, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Pain & Surgery Center, Adjust For Life Chiropractic, and Newburgh Primary Care committed mail fraud.

653.    At all relevant times, Schlusselberg, Khodak, Dassa, Datta, Kaloz, and Shubina knew that Leading Edge Medical Diagnostic, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Leading Edge Medical Diagnostic.

654.    Allstate estimates that the unlawful operation of the Leading Edge Medical Diagnostic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

### G.    SKAZKA ENTERPRISE

655.    Kostanian, Denevich, Khodak, Nimble Business Solutions, Dassa, Dassa Orthopedic Medical Services, Datta, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Kaloz, Adjust For Life Chiropractic, Shubina, and Newburgh Primary Care (and/or other persons working at their discretion and/or on their behalf) either used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care through Skazka to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

656.    Kostanian, Denevich, Khodak, Nimble Business Solutions, Dassa, Datta, Kaloz, and Shubina caused Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care mailed a demand for payment (i.e., invoice) to Allstate by and through Skazka.

657.    Kostanian's, Denevich's, and Khodak's management and control of Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Dassa Orthopedic Medical Services', Garden State Neuro Stimulation's, Datta Endoscopic Back Surgery & Pain Center's, Adjust For Life Chiropractic's, and Newburgh Primary Care's professional physician fees and profits, rendered Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care completely ineligible for No-Fault reimbursement under New York law.

658.    Because Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care were, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (persons not licensed to practice medicine, chiropractic, physical therapy, acupuncture or diagnostic radiology), Kostanian, Denevich, Khodak, Nimble Business Solutions, Dassa, Datta, Kaloz, and Shubina purposely caused Dassa Orthopedic Medical Services, Garden State Neuro Stimulation,

Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care to make a misrepresentation each and every time that Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care mailed a document to Allstate, by and through Skazka, claiming eligibility for reimbursement.

659.    Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully owned and controlled Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care, (b) Kostanian, Denevich, Khodak, Nimble Business Solutions, Dassa, Datta, Kaloz, and Shubina caused Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care to seek No-Fault reimbursement from Allstate, by and through Skazka, (even though Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care were not entitled to such reimbursement), and (c) that Kostanian, Denevich, Khodak, Nimble Business Solutions, Dassa, Dassa Orthopedic Medical Services, Datta, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Kaloz, Adjust For Life Chiropractic, Shubina, and Newburgh Primary Care used (or caused Skazka to use) the U.S. Mail to seek reimbursement, it is clear that Kostanian, Denevich, Khodak, Nimble Business Solutions, Dassa, Dassa Orthopedic Medical Services, Datta, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Kaloz, Adjust For Life Chiropractic, Shubina, and Newburgh Primary Care committed mail fraud.

660.    At all relevant times, Kostanian, Denevich, Khodak, Dassa, Datta, Kaloz, and Shubina knew that Skazka, Nimble Business Solutions, Dassa Orthopedic Medical Services,

Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, and Newburgh Primary Care.

661.    Allstate estimates that the unlawful operation of the Skazka enterprise generated hundreds of mailings by and through Skazka.  Tables highlighting selected examples of mailings made in furtherance of this scheme is annexed Exhibits 1 - 5 and incorporated by reference as if set forth in its entirety.

H.    NIMBLE BUSINESS SOLUTIONS ENTERPRISE

662.    Khodak, Kostanian, Denevich, Skazka, Dassa, Dassa Orthopedic Medical Services, Datta, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Kaloz, Adjust For Life Chiropractic, Shubina, Newburgh Primary Care, Schlusselberg, and Leading Edge Medical Diagnostic (and/or other persons working at their discretion and/or on their behalf) either used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic, Nimble Business Solutions to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

663.    Khodak, Kostanian, Denevich, Skazka, Dassa, Datta, Kaloz, Shubina, and Schlusselberg caused Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta

Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic mailed a demand for payment (i.e., invoice) to Allstate by and through Nimble Business Solutions.

664.    Kostanian's, Denevich's, and Khodak's management and control of Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic, combined with Kostanian's, Denevich's, and Khodak's unlawful receipt of Dassa Orthopedic Medical Services', Garden State Neuro Stimulation's, Datta Endoscopic Back Surgery & Pain Center's, Adjust For Life Chiropractic's, Newburgh Primary Care's, and Leading Edge Medical Diagnostic's professional physician fees and profits, rendered Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic completely ineligible for No-Fault reimbursement under New York law.

665.    Because Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic were, in fact, unlawfully controlled by Kostanian, Denevich, and Khodak (persons not licensed to practice medicine, chiropractic, physical therapy, acupuncture or diagnostic radiology), Khodak, Kostanian, Denevich, Skazka, Dassa, Datta, Kaloz, Shubina, and Schlusselberg purposely caused Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic,

Newburgh Primary Care, and Leading Edge Medical Diagnostic to make a misrepresentation each and every time that Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic mailed a document to Allstate, by and through Nimble Business Solutions, claiming eligibility for reimbursement.

666.    Moreover, because (a) Kostanian, Denevich, and Khodak unlawfully owned and controlled Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic, (b) Khodak, Kostanian, Denevich, Skazka, Dassa, Datta, Kaloz, Shubina, and Schlusselberg caused Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic to seek No-Fault reimbursement from Allstate, by and through Nimble Business Solutions, (even though Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic were not entitled to such reimbursement), and (c) that Khodak, Kostanian, Denevich, Skazka, Dassa, Dassa Orthopedic Medical Services, Datta, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Kaloz, Adjust For Life Chiropractic, Shubina, Newburgh Primary Care, Schlusselberg, and Leading Edge Medical Diagnostic used (or caused Nimble Business Solutions to use) the U.S. Mail to seek reimbursement, it is clear that Khodak, Kostanian, Denevich, Skazka, Dassa, Dassa Orthopedic Medical Services, Datta, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Kaloz, Adjust For Life Chiropractic, Shubina, Newburgh Primary Care, Schlusselberg, and Leading Edge Medical Diagnostic committed mail fraud.

667.    At all relevant times, Kostanian, Denevich, Khodak, Dassa, Datta, Kaloz, Shubina, and Schlusselberg knew that Skazka, Nimble Business Solutions, Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, a patient, a claimant, an insurance carrier, a patient's attorney, other medical provider(s), and/or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic.

668.    Allstate estimates that the unlawful operation of the Nimble Business Solutions enterprise generated hundreds of mailings by and through Nimble Business Solutions.  Tables highlighting selected examples of mailings made in furtherance of this scheme is annexed Exhibits 1 - 6 and incorporated by reference as if set forth in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    FRAUDULENT CONCEALMENT OF THE MANAGEMENT DEFENDANTS' UNLAWFUL CONTROL OF THE DASSA ORTHOPEDIC MEDICAL SERVICES ENTERPRISE

669.    Kostanian, Denevich, and/or Khodak induced Dassa to register himself with the State of New York as Dassa Orthopedic Medical Services' sole officer, director, and/or shareholder.

670.    The documents created and filed with the State of New York related to Dassa Orthopedic Medical Services deliberately omitted any reference to Kostanian's, Denevich's, Skazka's, Khodak's, or Nimble Business Solutions' involvement with Dassa or Dassa Orthopedic Medical Services.

671.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Dassa Orthopedic Medical Services, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Kostanian's, Denevich's, and Khodak's domination of and control over Dassa and Dassa Orthopedic Medical Services.

672.    Kostanian's, Denevich's, Khodak's, and Dassa's purposeful concealment of Kostanian's, Denevich's, and Khodak's controlling interest in Dassa Orthopedic Medical Services allowed Kostanian, Denevich, and Khodak to unlawfully control Dassa Orthopedic Medical Services undetected.

673.    At all times relevant during the operation of the Dassa Orthopedic Medical Services enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Dassa Orthopedic Medical Services, Kostanian, Denevich, Khodak, and Dassa caused Dassa Orthopedic Medical Services to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

674.    In their personal capacity and in their capacity as the co-owners of Skazka, Kostanian and Denevich directly participated in the operation and control of Dassa Orthopedic Medical Services, and thus caused Dassa Orthopedic Medical Services to falsely claim eligibility for No-Fault reimbursement.

675.    In his personal capacity and the owner of Nimble Business Solutions, Khodak directly participated in the operation and control of Dassa Orthopedic Medical Services, and thus caused Dassa Orthopedic Medical Services to falsely claim eligibility for No-Fault reimbursement.

676.    Further, Dassa attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection

with Dassa Orthopedic Medical Services patients, as well as the validity of the charges for such services.

677.    At all relevant times, Dassa, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

678.    At all relevant times, Kostanian, Denevich, Khodak, and Dassa actively concealed from Allstate facts regarding Dassa Orthopedic Medical Services' true ownership and control to prevent Allstate from discovering that Dassa Orthopedic Medical Services was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

679.    Many of these facts—particularly Dassa Orthopedic Medical Services' splitting of professional physician fees and profits with Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

680.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

681.    Thus, every time that Kostanian, Denevich, Khodak, and Dassa (along with those individuals working under their control) caused Dassa Orthopedic Medical Services to submit No-Fault reimbursement demands to Allstate, Kostanian, Denevich, Khodak, and Dassa (and those individuals working under their control) necessarily certified that Dassa Orthopedic Medical Services was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

682.     The full extent of Kostanian's, Denevich's, Khodak's, and Dassa's fraudulent and unlawful acts relative to their control over the Dassa Orthopedic Medical Services enterprise—including (a) Kostanian's, Denevich's, and Khodak's management and control of Dassa Orthopedic Medical Services, and (b) the unlawful channeling of Dassa Orthopedic Medical Services' professional proceeds to Kostanian, Denevich, and Khodak, personally and through Skazka and Nimble Business Solutions—was not, and could not have been, known to Allstate until it commenced this action.

### B.    FRAUDULENT CONCEALMENT OF THE MANAGEMENT DEFENDANTS' UNLAWFUL CONTROL OF THE GARDEN STATE NEURO STIMULATION ENTERPRISE

683.     Kostanian, Denevich, and/or Khodak induced Datta to register himself with the State of New York as Garden State Neuro Stimulation's sole officer, director, and/or shareholder.

684.     The documents created and filed with the State of New York related to Garden State Neuro Stimulation deliberately omitted any reference to Kostanian's, Denevich's, Skazka's, Khodak's, or Nimble Business Solutions' involvement with Datta or Garden State Neuro Stimulation.

685.     Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Garden State Neuro Stimulation, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Kostanian's, Denevich's, and Khodak's domination of and control over Datta and Garden State Neuro Stimulation.

686.     Kostanian's, Denevich's, Khodak's, and Datta's purposeful concealment of Kostanian's, Denevich's, and Khodak's controlling interest in Garden State Neuro Stimulation allowed Kostanian, Denevich, and Khodak to unlawfully control Garden State Neuro Stimulation undetected.

687.    At all times relevant during the operation of the Garden State Neuro Stimulation enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Garden State Neuro Stimulation, Kostanian, Denevich, Khodak, and Datta caused Garden State Neuro Stimulation to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

688.    In their personal capacity and in their capacity as the co-owners of Skazka, Kostanian and Denevich directly participated in the operation and control of Garden State Neuro Stimulation, and thus caused Garden State Neuro Stimulation to falsely claim eligibility for No-Fault reimbursement.

689.    In his personal capacity and the owner of Nimble Business Solutions, Khodak directly participated in the operation and control of Garden State Neuro Stimulation, and thus caused Garden State Neuro Stimulation to falsely claim eligibility for No-Fault reimbursement.

690.    Further, Datta attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Garden State Neuro Stimulation patients, as well as the validity of the charges for such services.

691.    At all relevant times, Datta, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

692.    At all relevant times, Kostanian, Denevich, Khodak, and Datta actively concealed from Allstate facts regarding Garden State Neuro Stimulation's true ownership and control to prevent Allstate from discovering that Garden State Neuro Stimulation was unlawfully

incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

693.    Many of these facts—particularly Garden State Neuro Stimulation's splitting of professional physician fees and profits with Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

694.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

695.    Thus, every time that Kostanian, Denevich, Khodak, and Datta (along with those individuals working under their control) caused Garden State Neuro Stimulation to submit No-Fault reimbursement demands to Allstate, Kostanian, Denevich, Khodak, and Datta (and those individuals working under their control) necessarily certified that Garden State Neuro Stimulation was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

696.    The full extent of Kostanian's, Denevich's, Khodak's, and Datta's fraudulent and unlawful acts relative to their control over the Garden State Neuro Stimulation enterprise— including (a) Kostanian's, Denevich's, and Khodak's management and control of Garden State Neuro Stimulation, and (b) the unlawful channeling of Garden State Neuro Stimulation's professional proceeds to Kostanian, Denevich, and Khodak, personally and through Skazka and Nimble Business Solutions—was not, and could not have been, known to Allstate until it commenced this action.

C.    FRAUDULENT CONCEALMENT OF THE MANAGEMENT DEFENDANTS' UNLAWFUL CONTROL OF THE DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER ENTERPRISE

697.    Kostanian, Denevich, and/or Khodak induced Datta to register himself with the State of New York as Datta Endoscopic Back Surgery & Pain Center's sole officer, director, and/or shareholder.

698.    The documents created and filed with the State of New York related to Datta Endoscopic Back Surgery & Pain Center deliberately omitted any reference to Kostanian's, Denevich's, Skazka's, Khodak's, or Nimble Business Solutions' involvement with Datta or Datta Endoscopic Back Surgery & Pain Center.

699.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Datta Endoscopic Back Surgery & Pain Center, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Kostanian's, Denevich's, and Khodak's domination of and control over Datta and Datta Endoscopic Back Surgery & Pain Center.

700.    Kostanian's, Denevich's, Khodak's, and Datta's purposeful concealment of Kostanian's, Denevich's, and Khodak's controlling interest in Datta Endoscopic Back Surgery & Pain Center allowed Kostanian, Denevich, and Khodak to unlawfully control Datta Endoscopic Back Surgery & Pain Center undetected.

701.    At all times relevant during the operation of the Datta Endoscopic Back Surgery & Pain Center enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Datta Endoscopic Back Surgery & Pain Center, Kostanian, Denevich, Khodak, and Datta caused Datta Endoscopic Back Surgery & Pain Center

to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

702.    In their personal capacity and in their capacity as the co-owners of Skazka, Kostanian and Denevich directly participated in the operation and control of Datta Endoscopic Back Surgery & Pain Center, and thus caused Datta Endoscopic Back Surgery & Pain Center to falsely claim eligibility for No-Fault reimbursement.

703.    In his personal capacity and the owner of Nimble Business Solutions, Khodak directly participated in the operation and control of Datta Endoscopic Back Surgery & Pain Center, and thus caused Datta Endoscopic Back Surgery & Pain Center to falsely claim eligibility for No-Fault reimbursement.

704.    Further, Datta attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Datta Endoscopic Back Surgery & Pain Center patients, as well as the validity of the charges for such services.

705.    At all relevant times, Datta, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

706.    At all relevant times, Kostanian, Denevich, Khodak, and Datta actively concealed from Allstate facts regarding Datta Endoscopic Back Surgery & Pain Center's true ownership and control to prevent Allstate from discovering that Datta Endoscopic Back Surgery & Pain Center was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

707.    Many of these facts—particularly Datta Endoscopic Back Surgery & Pain Center's splitting of professional physician fees and profits with Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

708.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

709.    Thus, every time that Kostanian, Denevich, Khodak, and Datta (along with those individuals working under their control) caused Datta Endoscopic Back Surgery & Pain Center to submit No-Fault reimbursement demands to Allstate, Kostanian, Denevich, Khodak, and Datta (and those individuals working under their control) necessarily certified that Datta Endoscopic Back Surgery & Pain Center was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

710.    The full extent of Kostanian's, Denevich's, Khodak's, and Datta's fraudulent and unlawful acts relative to their control over the Datta Endoscopic Back Surgery & Pain Center enterprise—including (a) Kostanian's, Denevich's, and Khodak's management and control of Datta Endoscopic Back Surgery & Pain Center, and (b) the unlawful channeling of Datta Endoscopic Back Surgery & Pain Center's professional proceeds to Kostanian, Denevich, and Khodak, personally and through Skazka and Nimble Business Solutions—was not, and could not have been, known to Allstate until it commenced this action.

**D.**    **FRAUDULENT CONCEALMENT OF THE MANAGEMENT DEFENDANTS' UNLAWFUL CONTROL OF THE ADJUST FOR LIFE CHIROPRACTIC ENTERPRISE**

711.    Kaloz registered himself with the State of New York as Adjust For Life Chiropractic's sole officer, director, and/or shareholder.

712.    At all relevant times, the documents created and filed with the State of New York related to Adjust For Life Chiropractic deliberately omitted any reference to Kostanian's, Denevich's, Skazka's, Khodak's, or Nimble Business Solutions' involvement with Kaloz or Adjust For Life Chiropractic.

713.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Adjust For Life Chiropractic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Kostanian's, Denevich's, and Khodak's domination of and control over Kaloz and Adjust For Life Chiropractic.

714.    Kostanian's, Denevich's, Khodak's, and Kaloz's purposeful concealment of Kostanian's, Denevich's, and Khodak's controlling interest in Adjust For Life Chiropractic allowed Kostanian, Denevich, and Khodak to unlawfully control Adjust For Life Chiropractic undetected.

715.    At all times relevant during the operation of the Adjust For Life Chiropractic enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Adjust For Life Chiropractic, Kostanian, Denevich, Khodak, and Kaloz caused Adjust For Life Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

716.    In their personal capacity and in their capacity as the co-owners of Skazka, Kostanian and Denevich directly participated in the operation and control of Adjust For Life

Chiropractic, and thus caused Adjust For Life Chiropractic to falsely claim eligibility for No-Fault reimbursement.

717.    In his personal capacity and the owner of Nimble Business Solutions, Khodak directly participated in the operation and control of Adjust For Life Chiropractic, and thus caused Adjust For Life Chiropractic to falsely claim eligibility for No-Fault reimbursement.

718.    Further, Kaloz attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with Adjust For Life Chiropractic patients, as well as the validity of the charges for such services.

719.    At all relevant times, Kaloz, as a duly licensed chiropractor, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

720.    At all relevant times, Kostanian, Denevich, Khodak, and Kaloz actively concealed from Allstate facts regarding Adjust For Life Chiropractic's true ownership and control to prevent Allstate from discovering that Adjust For Life Chiropractic was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

721.    Many of these facts—particularly Adjust For Life Chiropractic's splitting of professional physician fees and profits with Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

722.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

723.    Thus, every time that Kostanian, Denevich, Khodak, and Kaloz (along with those individuals working under their control) caused Adjust For Life Chiropractic to submit No-Fault reimbursement demands to Allstate, Kostanian, Denevich, Khodak, and Kaloz (and those individuals working under their control) necessarily certified that Adjust For Life Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

724.    The full extent of Kostanian's, Denevich's, Khodak's, and Kaloz's fraudulent and unlawful acts relative to their control over the Adjust For Life Chiropractic enterprise—including (a) Kostanian's, Denevich's, and Khodak's management and control of Adjust For Life Chiropractic, and (b) the unlawful channeling of Adjust For Life Chiropractic's professional proceeds to Kostanian, Denevich, and Khodak, personally and through Skazka and Nimble Business Solutions—was not, and could not have been, known to Allstate until it commenced this action.

### E.    FRAUDULENT CONCEALMENT OF THE MANAGEMENT DEFENDANTS' UNLAWFUL CONTROL OF THE NEWBURGH PRIMARY CARE ENTERPRISE

725.    Kostanian, Denevich, and/or Khodak induced Shubina to register herself with the State of New York as Newburgh Primary Care's sole officer, director, and/or shareholder.

726.    The documents created and filed with the State of New York related to Newburgh Primary Care deliberately omitted any reference to Kostanian's, Denevich's, Skazka's, Khodak's, or Nimble Business Solutions' involvement with Shubina or Newburgh Primary Care.

727.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Newburgh Primary Care, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Kostanian's, Denevich's, and Khodak's domination of and control over Shubina and Newburgh Primary Care.

728.    Kostanian's, Denevich's, Khodak's, and Shubina's purposeful concealment of Kostanian's, Denevich's, and Khodak's controlling interest in Newburgh Primary Care allowed Kostanian, Denevich, and Khodak to unlawfully control Newburgh Primary Care undetected.

729.    At all times relevant during the operation of the Newburgh Primary Care enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Newburgh Primary Care, Kostanian, Denevich, Khodak, and Shubina caused Newburgh Primary Care to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

730.    In their personal capacity and in their capacity as the co-owners of Skazka, Kostanian and Denevich directly participated in the operation and control of Newburgh Primary Care, and thus caused Newburgh Primary Care to falsely claim eligibility for No-Fault reimbursement.

731.    In his personal capacity and the owner of Nimble Business Solutions, Khodak directly participated in the operation and control of Newburgh Primary Care, and thus caused Newburgh Primary Care to falsely claim eligibility for No-Fault reimbursement.

732.    Further, Shubina attested (or caused the attestation) to the medical necessity of the services that she (or persons under her direction and control) allegedly performed in connection with Newburgh Primary Care patients, as well as the validity of the charges for such services.

733.    At all relevant times, Shubina, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of her oath as a licensed medical professional.

734.    At all relevant times, Kostanian, Denevich, Khodak, and Shubina actively concealed from Allstate facts regarding Newburgh Primary Care's true ownership and control to

prevent Allstate from discovering that Newburgh Primary Care was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

735.    Many of these facts—particularly Newburgh Primary Care's splitting of professional physician fees and profits with Kostanian, Denevich, Skazka, Khodak, and Nimble Business Solutions—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

736.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

737.    Thus, every time that Kostanian, Denevich, Khodak, and Shubina (along with those individuals working under their control) caused Newburgh Primary Care to submit No-Fault reimbursement demands to Allstate, Kostanian, Denevich, Khodak, and Shubina (and those individuals working under their control) necessarily certified that Newburgh Primary Care was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

738.    The full extent of Kostanian's, Denevich's, Khodak's, and Shubina's fraudulent and unlawful acts relative to their control over the Newburgh Primary Care enterprise—including (a) Kostanian's, Denevich's, and Khodak's management and control of Newburgh Primary Care, and (b) the unlawful channeling of Newburgh Primary Care's professional proceeds to Kostanian, Denevich, and Khodak, personally and through Skazka and Nimble Business Solutions—was not, and could not have been, known to Allstate until it commenced this action.

F.    **FRAUDULENT CONCEALMENT OF KHODAK'S UNLAWFUL CONTROL OF THE LEADING EDGE MEDICAL DIAGNOSTIC ENTERPRISE**

739.    Khodak induced Schlusselberg to register himself with the State of New York as Leading Edge Medical Diagnostic's sole officer, director, and/or shareholder.

740.    The documents created and filed with the State of New York related to Leading Edge Medical Diagnostic deliberately omitted any reference to Khodak's involvement with Schlusselberg or Leading Edge Medical Diagnostic.

741.    Based on representations contained within the four corners of the documents filed with the State of New York on behalf of Leading Edge Medical Diagnostic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Khodak's domination of and control over Schlusselberg and Leading Edge Medical Diagnostic.

742.    Khodak's and Schlusselberg's purposeful concealment of Khodak's controlling interest in Leading Edge Medical Diagnostic allowed Khodak to unlawfully control Leading Edge Medical Diagnostic undetected.

743.    At all times relevant during the operation of the Leading Edge Medical Diagnostic enterprise, to induce Allstate to pay promptly charges for health care services purportedly provided to patients who treated at Leading Edge Medical Diagnostic, Khodak and Schlusselberg caused Leading Edge Medical Diagnostic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

744.    Khodak directly participated in the operation and control of Leading Edge Medical Diagnostic, and thus caused Leading Edge Medical Diagnostic to falsely claim eligibility for No-Fault reimbursement.

745.    Further, Schlusselberg attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in

connection with Leading Edge Medical Diagnostic patients, as well as the validity of the charges for such services.

746. At all relevant times, Schlusselberg, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and was also legally and ethically obligated to act in accordance with any other aspect of his oath as a licensed medical professional.

747. At all relevant times, Khodak and Schlusselberg actively concealed from Allstate facts regarding Leading Edge Medical Diagnostic's true ownership and control to prevent Allstate from discovering that Leading Edge Medical Diagnostic was unlawfully incorporated, owned, and controlled by non-physicians and therefore ineligible to bill for or collect No-Fault benefits.

748. Many of these facts—particularly Leading Edge Medical Diagnostic's splitting of professional physician fees and profits with Khodak—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

749. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for treatment that was provided in accord with all applicable New York state licensing requirements.

750. Thus, every time that Khodak and Schlusselberg (along with those individuals working under their control) caused Leading Edge Medical Diagnostic to submit No-Fault reimbursement demands to Allstate, Khodak and Schlusselberg (and those individuals working under their control) necessarily certified that Leading Edge Medical Diagnostic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

751.    The full extent of Khodak's and Schlusselberg's fraudulent and unlawful acts relative to their control over the Leading Edge Medical Diagnostic enterprise—including (a) Khodak's management and control of Leading Edge Medical Diagnostic, and (b) the unlawful channeling of Leading Edge Medical Diagnostic's professional proceeds to Khodak—was not, and could not have been, known to Allstate until it commenced this action.

### G.    ALLSTATE'S JUSTIFIABLE RELIANCE

752.    Each claim submitted to Allstate by (or on behalf of) Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic, was verified pursuant to Insurance Law § 403.

753.    At all relevant times, Dassa, Datta, Kaloz, Shubina, and Schlusselberg, as duly licensed healthcare providers, were legally and ethically obligated to act honestly and with integrity, and were also legally and ethically obligated to act in accordance with any other aspect of their oath as a licensed medical professional.

754.    To induce Allstate to promptly pay Dassa Orthopedic Medical Services', Garden State Neuro Stimulation's, Datta Endoscopic Back Surgery & Pain Center's, Adjust For Life Chiropractic's, Newburgh Primary Care's, and Leading Edge Medical Diagnostic's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or other invoices certifying that Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic were eligible to be reimbursed under New York's No-Fault Laws.

755.     Further, to induce Allstate to promptly pay the fraudulent charges for healthcare and diagnostic imaging services purportedly provided to patients of Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic, the defendants hired law firms to pursue collection of the fraudulent charges from Allstate. These law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Dassa Orthopedic Medical Services', Garden State Neuro Stimulation's, Datta Endoscopic Back Surgery & Pain Center's, Adjust For Life Chiropractic's, Newburgh Primary Care's, and Leading Edge Medical Diagnostic's charges are not paid in full.

756.     Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

757.     At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Dassa Orthopedic Medical Services', Garden State Neuro Stimulation's, Datta Endoscopic Back Surgery & Pain Center's, Adjust For Life Chiropractic's, Newburgh Primary Care's, and Leading Edge Medical Diagnostic's reimbursement eligibility under New York law.

758.     In reasonable reliance on these misrepresentations, Allstate paid money to Dassa Orthopedic Medical Services, Garden State Neuro Stimulation, Datta Endoscopic Back Surgery & Pain Center, Adjust For Life Chiropractic, Newburgh Primary Care, and Leading Edge Medical Diagnostic to its detriment.

759.     Allstate would not have paid these monies had the defendants provided true and accurate information about Dassa Orthopedic Medical Services', Garden State Neuro

Stimulation's, Datta Endoscopic Back Surgery & Pain Center's, Adjust For Life Chiropractic's, Newburgh Primary Care's, and Leading Edge Medical Diagnostic's reimbursement eligibility under New York law, including the fact and necessity of the services provided.

## VIII.   **DAMAGES**

760.    The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments made in connection with first-party claims in excess of $1,310,403.01, the exact amount to be determined at trial, including:

(a) Payments made to Dassa Orthopedic Medical Services in connection with first-party claims in excess of $535,796.81, the exact amount to be determined at trial. The chart annexed as Exhibit 7, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Dassa Orthopedic Medical Services in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b) Payments made to Garden State Neuro Stimulation in connection with first-party claims in excess of $299,214.44, the exact amount to be determined at trial.  The chart annexed as Exhibit 8, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Garden State Neuro Stimulation in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(c) Payments made to Datta Endoscopic Back Surgery & Pain Center in connection with first-party claims in excess of $217,275.67, the exact amount to be determined at trial.

The chart annexed as Exhibit 9, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Datta Endoscopic Back Surgery & Pain Center in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(d) Payments made to Adjust For Life Chiropractic in connection with first-party claims in excess of $142,079.47, the exact amount to be determined at trial. The chart annexed as Exhibit 10, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Adjust For Life Chiropractic in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(e) Payments made to Newburgh Primary Care in connection with first-party claims in excess of $25,822.91, the exact amount to be determined at trial. The chart annexed as Exhibit 11, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Newburgh Primary Care in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(f) Payments made to Leading Edge Medical Diagnostic in connection with first-party claims in excess of $90,213.71, the exact amount to be determined at trial. The chart annexed as Exhibit 12, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Leading Edge Medical Diagnostic in connection with first-party claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

IX.    **CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DASSA ORTHOPEDIC MEDICAL SERVICES, P.C. D/B/A**
**C\V ORTHOPEDIC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., and Sukdeb Datta, M.D.)**

761.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

762.    Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic ("Dassa Orthopedic Medical Services") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

763.    In connection with the operation and management of the Dassa Orthopedic Medical Services enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., and Sukdeb Datta, M.D. (collectively "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Dassa Orthopedic Medical Services' business, or should have reasonably foreseen that the mailing of such false medical documentation by Dassa Orthopedic Medical Services would occur, in furtherance of their scheme to defraud.

764.    The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

765.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

766.    Policies of insurance were delivered to insureds through the U.S. Mail.

767.    Payments to Dassa Orthopedic Medical Services traveled through the U.S. Mail.

768.    As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Dassa Orthopedic Medical Services, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

769.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Dassa Orthopedic Medical Services for the benefit of the Count I Defendants that would not otherwise have been paid.

770.    The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

771.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

772.    By mailing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

773.   The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Dassa Orthopedic Medical Services for the benefit of the Count I Defendants.

774.   The Count I Defendants participated in the conduct of the Dassa Orthopedic Medical Services enterprise through a pattern of racketeering activities.

775.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

776.   The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

777.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

778.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

779.   By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION 18 U.S.C. § 1962(d)
### DASSA ORTHOPEDIC MEDICAL SERVICES, P.C. D/B/A
### C\V ORTHOPEDIC ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., and Sukdeb Datta, M.D.)**

780.   Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

781.    Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., and Sukdeb Datta, M.D. (collectively "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic ("Dassa Orthopedic Medical Services").

782.    The Count II Defendants each agreed to further, facilitate, support, and operate the Dassa Orthopedic Medical Services enterprise.

783.    As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

784.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Dassa Orthopedic Medical Services even though Dassa Orthopedic Medical Services was not eligible to collect such benefits by virtue of its unlawful conduct.

785.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

786.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count II Defendants' unlawful conduct described herein.

787.    By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### GARDEN STATE NEURO STIMULATION, LLC ENTERPRISE
#### (Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)

788.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

789.    Garden State Neuro Stimulation, LLC ("Garden State Neuro Stimulation") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

790.    In connection with the operation and management of the Garden State Neuro Stimulation enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D. (collectively "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Garden State Neuro Stimulation's business, or should have reasonably foreseen that the mailing of such false medical documentation by Garden State Neuro Stimulation would occur, in furtherance of their scheme to defraud.

791.    The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 2.

792.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

793.    Policies of insurance were delivered to insureds through the U.S. Mail.

794.    Payments to Garden State Neuro Stimulation traveled through the U.S. Mail.

795.    As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Garden State Neuro Stimulation, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

796.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Garden State Neuro Stimulation for the benefit of the Count III Defendants that would not otherwise have been paid.

797.    The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

798.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

799.    By mailing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

800.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Garden State Neuro Stimulation for the benefit of the Count III Defendants.

801.    The Count III Defendants participated in the conduct of the Garden State Neuro Stimulation enterprise through a pattern of racketeering activities.

802.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

803.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

804.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

805.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

806.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IV
### VIOLATION 18 U.S.C. § 1962(d)
### GARDEN STATE NEURO STIMULATION, LLC ENTERPRISE
### (Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)

807.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

808.    Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D. (collectively "Count IV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Garden State Neuro Stimulation, LLC ("Garden State Neuro Stimulation").

809.    The Count IV Defendants each agreed to further, facilitate, support, and operate the Garden State Neuro Stimulation enterprise.

810.    As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

811.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Garden State Neuro Stimulation even though Garden State Neuro Stimulation was not eligible to collect such benefits by virtue of its unlawful conduct.

812.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

813.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

814.    By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER, LLC ENTERPRISE
#### (Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)

815.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

816.    Datta Endoscopic Back Surgery & Pain Center, LLC ("Datta Endoscopic Back Surgery & Pain Center") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

817.    In connection with the operation and management of the Datta Endoscopic Back Surgery & Pain Center enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D. (collectively "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Datta Endoscopic Back Surgery & Pain Center's business, or should have reasonably foreseen that the mailing of such false medical documentation by Datta Endoscopic Back Surgery & Pain Center would occur, in furtherance of their scheme to defraud.

818.    The Count V Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 3.

819.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

820.    Policies of insurance were delivered to insureds through the U.S. Mail.

821.    Payments to Datta Endoscopic Back Surgery & Pain Center traveled through the U.S. Mail.

822.    As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Datta Endoscopic Back Surgery & Pain Center, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

823.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Datta Endoscopic Back Surgery & Pain Center for the benefit of the Count V Defendants that would not otherwise have been paid.

824.    The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

825.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

826.    By mailing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

827.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Datta Endoscopic Back Surgery & Pain Center for the benefit of the Count V Defendants.

828.    The Count V Defendants participated in the conduct of the Datta Endoscopic Back Surgery & Pain Center enterprise through a pattern of racketeering activities.

829.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

830.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

831.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

832.     Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

833.     By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION 18 U.S.C. § 1962(d)**
**DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)**

834.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

835.     Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D. (collectively "Count VI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Datta Endoscopic Back Surgery & Pain Center, LLC ("Datta Endoscopic Back Surgery & Pain Center").

836.     The Count VI Defendants each agreed to further, facilitate, support, and operate the Datta Endoscopic Back Surgery & Pain Center enterprise.

837.     As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

838.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Datta Endoscopic Back Surgery & Pain Center even though Datta Endoscopic Back Surgery & Pain Center was not eligible to collect such benefits by virtue of its unlawful conduct.

839.    The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

840.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count VI Defendants' unlawful conduct described herein.

841.    By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ADJUST FOR LIFE CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Darrin Kaloz, D.C.)**

842.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

843.    Adjust For Life Chiropractic, P.C. ("Adjust For Life Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

844.    In connection with the operation and management of the Adjust For Life Chiropractic enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Darrin Kaloz, D.C. (collectively "Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or

knew that such false medical documentation would be mailed in the ordinary course of Adjust For Life Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Adjust For Life Chiropractic would occur, in furtherance of their scheme to defraud.

845.    The Count VII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 4.

846.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

847.    Policies of insurance were delivered to insureds through the U.S. Mail.

848.    Payments to Adjust For Life Chiropractic traveled through the U.S. Mail.

849.    As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Adjust For Life Chiropractic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

850.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Adjust For Life Chiropractic for the benefit of the Count VII Defendants that would not otherwise have been paid.

851.    The Count VII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

852.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

853.    By mailing numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

854.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Adjust For Life Chiropractic for the benefit of the Count VII Defendants.

855.    The Count VII Defendants participated in the conduct of the Adjust For Life Chiropractic enterprise through a pattern of racketeering activities.

856.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

857.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

858.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

859.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

860.    By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION 18 U.S.C. § 1962(d)
### ADJUST FOR LIFE CHIROPRACTIC, P.C. ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Darrin Kaloz, D.C.)**

861.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

862.    Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Darrin Kaloz, D.C. (collectively "Count VIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Adjust For Life Chiropractic, P.C. ("Adjust For Life Chiropractic").

863.    The Count VIII Defendants each agreed to further, facilitate, support, and operate the Adjust For Life Chiropractic enterprise.

864.    As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

865.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Adjust For Life Chiropractic even though Adjust For Life Chiropractic was not eligible to collect such benefits by virtue of its unlawful conduct.

866.    The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

867.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count VIII Defendants' unlawful conduct described herein.

868.    By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### NEWBURGH PRIMARY CARE, P.C. D/B/A
### ELITE ORTHOPEDICS ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Yelena Shubina, M.D.)**

869.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

870.    Newburgh Primary Care, P.C. d/b/a Elite Orthopedics ("Newburgh Primary Care") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

871.    In connection with the operation and management of the Newburgh Primary Care enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Yelena Shubina, M.D. (collectively "Count IX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Newburgh Primary Care's business, or should have reasonably foreseen that the mailing of such false medical documentation by Newburgh Primary Care would occur, in furtherance of their scheme to defraud.

872.    The Count IX Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

873.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

874.    Policies of insurance were delivered to insureds through the U.S. Mail.

875.    Payments to Newburgh Primary Care traveled through the U.S. Mail.

876.    As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Newburgh Primary Care, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

877.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Newburgh Primary Care for the benefit of the Count IX Defendants that would not otherwise have been paid.

878.    The Count IX Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

879.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

880.    By mailing numerous fraudulent claims in an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

881.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Newburgh Primary Care for the benefit of the Count IX Defendants.

882.    The Count IX Defendants participated in the conduct of the Newburgh Primary Care enterprise through a pattern of racketeering activities.

883.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

884.    The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

885.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

886.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

887.    By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION 18 U.S.C. § 1962(d)
### NEWBURGH PRIMARY CARE, P.C. D/B/A
### ELITE ORTHOPEDICS ENTERPRISE
### (Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Yelena Shubina, M.D.)

888.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

889.    Defendants Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Yelena Shubina, M.D. (collectively "Count X Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Newburgh Primary Care, P.C. d/b/a Elite Orthopedics ("Newburgh Primary Care").

890.     The Count X Defendants each agreed to further, facilitate, support, and operate the Newburgh Primary Care enterprise.

891.     As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

892.     The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Newburgh Primary Care even though Newburgh Primary Care was not eligible to collect such benefits by virtue of its unlawful conduct.

893.     The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

894.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count X Defendants' unlawful conduct described herein.

895.     By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### LEADING EDGE MEDICAL DIAGNOSTIC, P.C. ENTERPRISE
**(Against Gennadi Khodak, Daniel Schlusselberg, M.D., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain Center, LLC)**

896.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

897.    Leading Edge Medical Diagnostic, P.C. ("Leading Edge Medical Diagnostic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

898.    In connection with the operation and management of the Leading Edge Medical Diagnostic enterprise and with each of the claims identified in plaintiffs' Complaint, Defendants Gennadi Khodak, Daniel Schlusselberg, M.D., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC and Datta Endoscopic Back Surgery & Pain Center, LLC (collectively "Count XI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Leading Edge Medical Diagnostic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Leading Edge Medical Diagnostic would occur, in furtherance of their scheme to defraud.

899.    The Count XI Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

900.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

901.    Policies of insurance were delivered to insureds through the U.S. Mail.

902.    Payments to Leading Edge Medical Diagnostic traveled through the U.S. Mail.

903.    As documented above, the Count XI Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or

services that were purportedly performed at Leading Edge Medical Diagnostic, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

904.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Leading Edge Medical Diagnostic for the benefit of the Count XI Defendants that would not otherwise have been paid.

905.    The Count XI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

906.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

907.    By mailing numerous fraudulent claims in an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

908.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Leading Edge Medical Diagnostic for the benefit of the Count XI Defendants.

909.    The Count XI Defendants participated in the conduct of the Leading Edge Medical Diagnostic enterprise through a pattern of racketeering activities.

910.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

911.    The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

912.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

913.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

914.    By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATION 18 U.S.C. § 1962(d)**
**LEADING EDGE MEDICAL DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Gennadi Khodak, Daniel Schlusselberg, M.D., Gabriel Dassa, D.O.,**
**Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic,**
**Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain**
**Center, LLC)**

915.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

916.    Defendants Gennadi Khodak, Daniel Schlusselberg, M.D., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC and Datta Endoscopic Back Surgery & Pain Center, LLC (collectively "Count XII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Leading Edge Medical Diagnostic, P.C. ("Leading Edge Medical Diagnostic").

917.    The Count XII Defendants each agreed to further, facilitate, support, and operate the Leading Edge Medical Diagnostic enterprise.

918.    As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

919.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Leading Edge Medical Diagnostic even though Leading Edge Medical Diagnostic was not eligible to collect such benefits by virtue of its unlawful conduct.

920.    The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

921.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XII Defendants' unlawful conduct described herein.

922.    By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SKAZKA, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

923.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

924.    In connection with each of the claims identified in plaintiffs' Complaint, Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic

Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics (collectively, "Count XIII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

925.    The Count XIII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 1-6.

926.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

927.    Policies of insurance were delivered to insureds through the U.S. Mail.

928.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

929.    As documented above, the Count XIII Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

930.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta

Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics for the benefit of the Count XIII Defendants, that would not otherwise have been paid.

931.    The Count XIII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

932.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

933.    By filing numerous fraudulent claims in an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

934.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics for the benefit of the Count XIII Defendants.

935.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

936.    Skazka, LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

937.    The Count XIII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

938.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

939.    The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

940.    By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**SKAZKA, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

941.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

942.    Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics (collectively, "Count XIV Defendants")

willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Skazka, LLC ("Skazka").

943.    The Count XIV Defendants each agreed to further, facilitate, support, and operate the Skazka enterprise.

944.    As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

945.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics even though Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics were not eligible to collect such benefits by virtue of their unlawful conduct.

946.    The purpose of this conspiracy was also to unlawfully channel to Kostanian and Denevich, through Skazka, LLC, the professional fees and profits of Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

947.    The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

948.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XIV Defendants' unlawful conduct described herein.

949.    By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NIMBLE BUSINESS SOLUTIONS, INC. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Skazka, LLC, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

950.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

951.    In connection with each of the claims identified in plaintiffs' Complaint, Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Skazka, LLC, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics (collectively, "Count XV Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

952.    The Count XV Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 1-6.

953.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

954.    Policies of insurance were delivered to insureds through the U.S. Mail.

955.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

956.    As documented above, the Count XV Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

957.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics for the benefit of the Count XV Defendants, that would not otherwise have been paid.

958.    The Count XV Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

959.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

960.    By filing numerous fraudulent claims in an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

961.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics for the benefit of the Count XV Defendants.

962.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

963.    Nimble Business Solutions, Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

964.    The Count XV Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

965.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

966.     The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

967.     By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**NIMBLE BUSINESS SOLUTIONS, INC. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Skazka, LLC, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

968.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

969.     Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Skazka, LLC, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics (collectively, "Count XVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through the operation of Nimble Business Solutions, Inc. ("Skazka").

970.     The Count XVI Defendants each agreed to further, facilitate, support, and operate the Skazka enterprise.

971.     As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

972.    The purpose of the conspiracy was to obtain payments and No-Fault insurance benefits from Allstate on behalf of Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics even though Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics were not eligible to collect such benefits by virtue of their unlawful conduct.

973.    The purpose of this conspiracy was also to unlawfully channel to Kostanian and Denevich, through Nimble Business Solutions, Inc., the professional fees and profits of Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

974.    The Count XVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

975.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Count XVI Defendants' unlawful conduct described herein.

976.    By virtue of the Count XVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVII**
**COMMON LAW FRAUD**
**(Against Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Arthur Kostanian, Skazka, LLC, Sergey Denevich, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

977.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

978.    Defendants Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XVII Defendants") conspired to defraud Allstate through their unlawful management and control of Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic

979.    The Count XVII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic was entitled to receive No-Fault reimbursement under New York law.

980.    These misrepresentations of fact by the Count XVII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XVII Defendants' reports, invoices and collection documentation.

981.    The Count XVII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

982.    These misrepresentations were intentionally made by the Count XVII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

983.    The Count XVII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

984.    Allstate reasonably relied, to its detriment, upon the Count XVII Defendants' material misrepresentations concerning Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

985.    Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic totaling at least $535,796.81, even though Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XVIII
### COMMON LAW FRAUD
**(Against Garden State Neuro Stimulation, LLC, Sukdeb Datta, M.D.,
Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak,
and Nimble Business Solutions, Inc.)**

986.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

987.    Defendants Garden State Neuro Stimulation, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XVIII Defendants") conspired to defraud Allstate through their unlawful management and control of Garden State Neuro Stimulation, LLC

988.    The Count XVIII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Garden State Neuro Stimulation, LLC was entitled to receive No-Fault reimbursement under New York law.

989.    These misrepresentations of fact by the Count XVIII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XVI Defendants' reports, invoices and collection documentation.

990.    The Count XVIII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

991.    These misrepresentations were intentionally made by the Count XVIII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Garden State Neuro Stimulation, LLC—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

992.    The Count XVIII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

993.    Allstate reasonably relied, to its detriment, upon the Count XVIII Defendants' material misrepresentations concerning Garden State Neuro Stimulation, LLC's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

994.    Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Garden State Neuro Stimulation, LLC totaling at least $299,214.44, even though Garden State Neuro Stimulation, LLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XIX**
**COMMON LAW FRAUD**
**(Against Datta Endoscopic Back Surgery & Pain Center, LLC, Sukdeb Datta, M.D.,
Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business
Solutions, Inc.)**

995.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth
in paragraphs 1-760 as if set forth fully herein.

996.    Defendants Datta Endoscopic Back Surgery & Pain Center, LLC, Sukdeb Datta,
M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business
Solutions, Inc. (collectively, "Count XIX Defendants") conspired to defraud Allstate through their
unlawful management and control of Datta Endoscopic Back Surgery & Pain Center, LLC.

997.    The Count XIX Defendants' scheme to defraud Allstate was reliant upon a
succession of material misrepresentations of fact that Datta Endoscopic Back Surgery & Pain
Center, LLC was entitled to receive No-Fault reimbursement under New York law.

998.    These misrepresentations of fact by the Count XIX Defendants included, but were
not limited to, the material misrepresentations of fact made in the Count XIX Defendants' reports,
invoices and collection documentation.

999.    The Count XIX Defendants' representations were false or required disclosure of
additional facts to render the information furnished not misleading.

1000.   These misrepresentations were intentionally made by the Count XIX Defendants in
furtherance of the scheme to defraud Allstate by submitting claims from Datta Endoscopic Back
Surgery & Pain Center, LLC—an unlawfully operated and controlled professional corporation—
for payment of No-Fault insurance benefits.

1001.   The Count XIX Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1002.   Allstate reasonably relied, to its detriment, upon the Count XIX Defendants' material misrepresentations concerning Datta Endoscopic Back Surgery & Pain Center, LLC's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1003.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Datta Endoscopic Back Surgery & Pain Center, LLC totaling at least $217,275.67, even though Datta Endoscopic Back Surgery & Pain Center, LLC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XX
### COMMON LAW FRAUD
**(Against Adjust For Life Chiropractic, P.C., Darrin Kaloz, D.C., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1004.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1005.   Defendants Adjust For Life Chiropractic, P.C., Darrin Kaloz, D.C., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XX Defendants") conspired to defraud Allstate through their unlawful management and control of Adjust For Life Chiropractic, P.C.

1006.   The Count XX Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Adjust For Life Chiropractic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1007.    These misrepresentations of fact by the Count XX Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XX Defendants' reports, invoices and collection documentation.

1008.    The Count XX Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1009.    These misrepresentations were intentionally made by the Count XX Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Adjust For Life Chiropractic, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1010.    The Count XX Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1011.    Allstate reasonably relied, to its detriment, upon the Count XX Defendants' material misrepresentations concerning Adjust For Life Chiropractic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1012.    Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Adjust For Life Chiropractic, P.C. totaling at least $142,079.47, even though Adjust For Life Chiropractic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXI**
**COMMON LAW FRAUD**
**(Against Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Yelena Shubina, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1013.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1014.    Defendants Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Yelena Shubina, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XXI Defendants") conspired to defraud Allstate through their unlawful management and control of Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

1015.    The Count XXI Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Newburgh Primary Care, P.C. d/b/a Elite Orthopedics was entitled to receive No-Fault reimbursement under New York law.

1016.    These misrepresentations of fact by the Count XXI Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XXI Defendants' reports, invoices and collection documentation.

1017.    The Count XXI Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1018.    These misrepresentations were intentionally made by the Count XXI Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Newburgh Primary Care, P.C. d/b/a Elite Orthopedics—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1019.   The Count XXI Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1020.   Allstate reasonably relied, to its detriment, upon the Count XXI Defendants' material misrepresentations concerning Newburgh Primary Care, P.C. d/b/a Elite Orthopedics's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1021.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Newburgh Primary Care, P.C. d/b/a Elite Orthopedics totaling at least $25,822.91, even though Newburgh Primary Care, P.C. d/b/a Elite Orthopedics was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

### COUNT XXII
### COMMON LAW FRAUD
**(Against Leading Edge Medical Diagnostic, P.C., Daniel Schlusselberg, M.D., Gennadi Khodak, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain Center, LLC)**

1022.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1023.   Defendants Leading Edge Medical Diagnostic, P.C., Daniel Schlusselberg, M.D., Gennadi Khodak, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC and Datta Endoscopic Back Surgery & Pain Center, LLC (collectively, "Count XXII Defendants") conspired to defraud Allstate through the unlawful management and control of Leading Edge Medical Diagnostic, P.C.

1024.   The Count XXII Defendants' scheme to defraud Allstate was reliant upon a succession of material misrepresentations of fact that Leading Edge Medical Diagnostic, P.C. was entitled to receive No-Fault reimbursement under New York law.

1025.   These misrepresentations of fact by the Count XXII Defendants included, but were not limited to, the material misrepresentations of fact made in the Count XXII Defendants' reports, invoices and collection documentation.

1026.   The Count XXII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1027.   These misrepresentations were intentionally made by the Count XXII Defendants in furtherance of the scheme to defraud Allstate by submitting claims from Leading Edge Medical Diagnostic, P.C.—an unlawfully operated and controlled professional corporation—for payment of No-Fault insurance benefits.

1028.   The Count XXII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1029.   Allstate reasonably relied, to its detriment, upon the Count XXII Defendants' material misrepresentations concerning Leading Edge Medical Diagnostic, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

1030.   Allstate's damages include, but are not necessarily limited to, No-Fault benefit payments made by Allstate to Leading Edge Medical Diagnostic, P.C. totaling at least $90,213.71, even though Leading Edge Medical Diagnostic, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXIII**
**UNJUST ENRICHMENT**
**(Against Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1031.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1032.    As alleged herein, Defendants Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XXIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic.

1033.    As alleged herein, Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic was unlawfully operated in violation of New York law.

1034.  When Allstate paid Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIII Defendants, or those persons working under their control, made concerning Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic's reimbursement eligibility under New York's No-Fault Laws.

1035.    Each and every No-Fault reimbursement payment that Allstate was caused to make to Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic during the course of the scheme constitutes a benefit that the Count XXIII Defendants aggressively caused Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic to seek and voluntarily accept.

1036.   Throughout the course of their scheme, the Count XXIII Defendants caused Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $535,796.81 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1037.   Retention of those benefits by the Count XXIII Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXIV
### UNJUST ENRICHMENT
**(Against Garden State Neuro Stimulation, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1038.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1039.   As alleged herein, Defendants Garden State Neuro Stimulation, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XXIV Defendants") conspired to induce Allstate to make numerous and substantial payments to Garden State Neuro Stimulation, LLC.

1040.   As alleged herein, Garden State Neuro Stimulation, LLC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Garden State Neuro Stimulation, LLC was unlawfully operated in violation of New York law.

1041.   When Allstate paid Garden State Neuro Stimulation, LLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIV Defendants, or those persons working under their control, made concerning Garden State Neuro Stimulation, LLC's reimbursement eligibility under New York's No-Fault Laws.

1042.    Each and every No-Fault reimbursement payment that Allstate was caused to make to Garden State Neuro Stimulation, LLC during the course of the scheme constitutes a benefit that the Count XXIV Defendants aggressively caused Garden State Neuro Stimulation, LLC to seek and voluntarily accept.

1043.    Throughout the course of their scheme, the Count XXIV Defendants caused Garden State Neuro Stimulation, LLC to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $299,214.44 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1044.    Retention of those benefits by the Count XXIV Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Datta Endoscopic Back Surgery & Pain Center, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1045.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1046.    As alleged herein, Defendants Datta Endoscopic Back Surgery & Pain Center, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XXV Defendants") conspired to induce Allstate to make numerous and substantial payments to Datta Endoscopic Back Surgery & Pain Center, LLC.

1047.    As alleged herein, Datta Endoscopic Back Surgery & Pain Center, LLC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Datta

Endoscopic Back Surgery & Pain Center, LLC was unlawfully operated in violation of New York law.

1048.   When Allstate paid Datta Endoscopic Back Surgery & Pain Center, LLC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXV Defendants, or those persons working under their control, made concerning Datta Endoscopic Back Surgery & Pain Center, LLC's reimbursement eligibility under New York's No-Fault Laws.

1049.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Datta Endoscopic Back Surgery & Pain Center, LLC during the course of the scheme constitutes a benefit that the Count XXV Defendants aggressively caused Datta Endoscopic Back Surgery & Pain Center, LLC to seek and voluntarily accept.

1050.   Throughout the course of their scheme, the Count XXV Defendants caused Datta Endoscopic Back Surgery & Pain Center, LLC to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $217,275.67 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1051.   Retention of those benefits by the Count XXV Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXVI
### UNJUST ENRICHMENT
**(Against Adjust For Life Chiropractic, P.C., Darrin Kaloz, D.C., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1052.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1053.   As alleged herein, Defendants Adjust For Life Chiropractic, P.C., Darrin Kaloz, D.C., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business

Solutions, Inc. (collectively, "Count XXVI Defendants") conspired to induce Allstate to make numerous and substantial payments to Adjust For Life Chiropractic, P.C.

1054. As alleged herein, Adjust For Life Chiropractic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Adjust For Life Chiropractic, P.C. was unlawfully operated in violation of New York law.

1055. When Allstate paid Adjust For Life Chiropractic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVI Defendants, or those persons working under their control, made concerning Adjust For Life Chiropractic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1056. Each and every No-Fault reimbursement payment that Allstate was caused to make to Adjust For Life Chiropractic, P.C. during the course of the scheme constitutes a benefit that the Count XXVI Defendants aggressively caused Adjust For Life Chiropractic, P.C. to seek and voluntarily accept.

1057. Throughout the course of their scheme, the Count XXVI Defendants caused Adjust For Life Chiropractic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $142,079.47 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1058. Retention of those benefits by the Count XXVI Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXVII**
**UNJUST ENRICHMENT**
**(Against Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Yelena Shubina, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

1059.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1060.   As alleged herein, Defendants Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Yelena Shubina, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc. (collectively, "Count XXVII Defendants") conspired to induce Allstate to make numerous and substantial payments to Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

1061.   As alleged herein, Newburgh Primary Care, P.C. d/b/a Elite Orthopedics was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Newburgh Primary Care, P.C. d/b/a Elite Orthopedics was unlawfully operated in violation of New York law.

1062.   When Allstate paid Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVII Defendants, or those persons working under their control, made concerning Newburgh Primary Care, P.C. d/b/a Elite Orthopedics's reimbursement eligibility under New York's No-Fault Laws.

1063.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Newburgh Primary Care, P.C. d/b/a Elite Orthopedics during the course of the scheme constitutes a benefit that the Count XXVII Defendants aggressively caused Newburgh Primary Care, P.C. d/b/a Elite Orthopedics to seek and voluntarily accept.

1064.   Throughout the course of their scheme, the Count XXVII Defendants caused Newburgh Primary Care, P.C. d/b/a Elite Orthopedics to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $25,822.91 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1065.   Retention of those benefits by the Count XXVII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXVIII**
**UNJUST ENRICHMENT**
**(Against Leading Edge Medical Diagnostic, P.C., Daniel Schlusselberg, M.D.,**
**Gennadi Khodak, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical**
**Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, and**
**Datta Endoscopic Back Surgery & Pain Center, LLC)**

1066.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1067.   As alleged herein, Defendants Leading Edge Medical Diagnostic, P.C., Daniel Schlusselberg, M.D., Gennadi Khodak, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC and Datta Endoscopic Back Surgery & Pain Center, LLC (collectively, "Count XXVIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Leading Edge Medical Diagnostic, P.C.

1068.   As alleged herein, Leading Edge Medical Diagnostic, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Leading Edge Medical Diagnostic, P.C. was unlawfully operated in violation of New York law.

1069.   When Allstate paid Leading Edge Medical Diagnostic, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVIII Defendants, or those persons working under their control,

made concerning Leading Edge Medical Diagnostic, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

1070.   Each and every No-Fault reimbursement payment that Allstate was caused to make to Leading Edge Medical Diagnostic, P.C. during the course of the scheme constitutes a benefit that the Count XXVIII Defendants aggressively caused Leading Edge Medical Diagnostic, P.C. to seek and voluntarily accept.

1071.   Throughout the course of their scheme, the Count XXVIII Defendants caused Leading Edge Medical Diagnostic, P.C. to wrongfully obtain from Allstate No-Fault benefit payments totaling at least $90,213.71 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1072.   Retention of those benefits by the Count XXVIII Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Dassa Orthopedic Medical Services, P.C. d/b/a
### C\V Orthopedic)

1073.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1074.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1075.   In view of its billing for medically unnecessary and excessive healthcare services, Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1076.   Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1077.   Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic continues to challenge Allstate's prior claim denials.

1078.   Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1079.   A justifiable controversy exists between Allstate and Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic because Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic rejects Allstate's ability to deny such claims.

1080.   Allstate has no adequate remedy at law.

1081.   Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic.

1082.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic.

**COUNT XXX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Garden State Neuro Stimulation, LLC)**

1083.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1084.    An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1085.    In view of its billing for medically unnecessary and excessive healthcare services, Garden State Neuro Stimulation, LLC has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1086.    Garden State Neuro Stimulation, LLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1087.    Garden State Neuro Stimulation, LLC continues to challenge Allstate's prior claim denials.

1088.    Garden State Neuro Stimulation, LLC continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1089.    A justifiable controversy exists between Allstate and Garden State Neuro Stimulation, LLC because Garden State Neuro Stimulation, LLC rejects Allstate's ability to deny such claims.

1090.    Allstate has no adequate remedy at law.

1091.    Garden State Neuro Stimulation, LLC also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Garden State Neuro Stimulation, LLC.

1092.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Garden State Neuro Stimulation, LLC has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Garden State Neuro Stimulation, LLC.

## COUNT XXXI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Datta Endoscopic Back Surgery & Pain Center, LLC)

1093.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1094.    An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1095.    In view of its billing for medically unnecessary and excessive healthcare services, Datta Endoscopic Back Surgery & Pain Center, LLC has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1096.   Datta Endoscopic Back Surgery & Pain Center, LLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1097.   Datta Endoscopic Back Surgery & Pain Center, LLC continues to challenge Allstate's prior claim denials.

1098.   Datta Endoscopic Back Surgery & Pain Center, LLC continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1099.   A justifiable controversy exists between Allstate and Datta Endoscopic Back Surgery & Pain Center, LLC because Datta Endoscopic Back Surgery & Pain Center, LLC rejects Allstate's ability to deny such claims.

1100.   Allstate has no adequate remedy at law.

1101.   Datta Endoscopic Back Surgery & Pain Center, LLC also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Datta Endoscopic Back Surgery & Pain Center, LLC.

1102.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Datta Endoscopic Back Surgery & Pain Center, LLC has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Datta Endoscopic Back Surgery & Pain Center, LLC.

**COUNT XXXII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Adjust For Life Chiropractic, P.C.)**

1103.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1104.    An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1105.    In view of its billing for medically unnecessary and excessive healthcare services, Adjust For Life Chiropractic, P.C. has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1106.    Adjust For Life Chiropractic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1107.    Adjust For Life Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1108.    Adjust For Life Chiropractic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1109.    A justifiable controversy exists between Allstate and Adjust For Life Chiropractic, P.C. because Adjust For Life Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1110.    Allstate has no adequate remedy at law.

1111.    Adjust For Life Chiropractic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate

has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Adjust For Life Chiropractic, P.C.

1112.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Adjust For Life Chiropractic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Adjust For Life Chiropractic, P.C.

## COUNT XXXIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)

1113.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1114.  An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1115.  In view of its billing for medically unnecessary and excessive healthcare services, Newburgh Primary Care, P.C. d/b/a Elite Orthopedics has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1116.  Newburgh Primary Care, P.C. d/b/a Elite Orthopedics continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1117.    Newburgh Primary Care, P.C. d/b/a Elite Orthopedics continues to challenge Allstate's prior claim denials.

1118.    Newburgh Primary Care, P.C. d/b/a Elite Orthopedics continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1119.    A justifiable controversy exists between Allstate and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics because Newburgh Primary Care, P.C. d/b/a Elite Orthopedics rejects Allstate's ability to deny such claims.

1120.    Allstate has no adequate remedy at law.

1121.    Newburgh Primary Care, P.C. d/b/a Elite Orthopedics also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

1122.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Newburgh Primary Care, P.C. d/b/a Elite Orthopedics has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Newburgh Primary Care, P.C. d/b/a Elite Orthopedics

## COUNT XXXIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Leading Edge Medical Diagnostic, P.C.)

1123.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-760 as if set forth fully herein.

1124.   An assignee provider of healthcare services is only eligible to receive assigned No-Fault benefits for treatments, tests, and services that are medically necessary.

1125.   In view of its billing for medically unnecessary and excessive healthcare services, Leading Edge Medical Diagnostic, P.C. has, at all relevant times, has been operating in violation of one or more New York State law (including, but not limited to, New York Insurance Law and the regulations promulgated pursuant thereto (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

1126.   Leading Edge Medical Diagnostic, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

1127.   Leading Edge Medical Diagnostic, P.C. continues to challenge Allstate's prior claim denials.

1128.   Leading Edge Medical Diagnostic, P.C. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1129.   A justifiable controversy exists between Allstate and Leading Edge Medical Diagnostic, P.C. because Leading Edge Medical Diagnostic, P.C. rejects Allstate's ability to deny such claims.

1130.   Allstate has no adequate remedy at law.

1131.   Leading Edge Medical Diagnostic, P.C. also will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Leading Edge Medical Diagnostic, P.C.

1132.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) Leading Edge Medical Diagnostic, P.C. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Leading Edge Medical Diagnostic, P.C.

## X.    **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DASSA ORTHOPEDIC MEDICAL SERVICES, P.C. D/B/A C\V ORTHOPEDIC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., and Sukdeb Datta, M.D.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION 18 U.S.C. § 1962(d)
### DASSA ORTHOPEDIC MEDICAL SERVICES, P.C. D/B/A C\V ORTHOPEDIC ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., and Sukdeb Datta, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### GARDEN STATE NEURO STIMULATION, LLC ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION 18 U.S.C. § 1962(d)
### GARDEN STATE NEURO STIMULATION, LLC ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT V
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT VI
**VIOLATION 18 U.S.C. § 1962(d)**
**DATTA ENDOSCOPIC BACK SURGERY & PAIN CENTER, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Sukdeb Datta, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

<u>**COUNT VII**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ADJUST FOR LIFE CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble**
**Business Solutions, Inc., and Darrin Kaloz, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and
attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct
alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

<u>**COUNT VIII**</u>
**VIOLATION 18 U.S.C. § 1962(d)**
**ADJUST FOR LIFE CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble**
**Business Solutions, Inc., and Darrin Kaloz, D.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct
alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

<u>**COUNT IX**</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NEWBURGH PRIMARY CARE, P.C. D/B/A**
**ELITE ORTHOPEDICS ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble**
**Business Solutions, Inc., and Yelena Shubina, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and
attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION 18 U.S.C. § 1962(d)
### NEWBURGH PRIMARY CARE, P.C. D/B/A
### ELITE ORTHOPEDICS ENTERPRISE
**(Against Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, Nimble Business Solutions, Inc., and Yelena Shubina, M.D.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### LEADING EDGE MEDICAL DIAGNOSTIC, P.C. ENTERPRISE
**(Against Gennadi Khodak, Daniel Schlusselberg, M.D., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain Center, LLC)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATION 18 U.S.C. § 1962(d)**
**LEADING EDGE MEDICAL DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Gennadi Khodak, Daniel Schlusselberg, M.D., Gabriel Dassa, D.O.,**
**Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic,**
**Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain**
**Center, LLC)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct

alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SKAZKA, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Nimble Business Solutions,**
**Inc., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D.,**
**Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro**
**Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life**
**Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and

attorneys' fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct

alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

**COUNT XIV**
**VIOLATION 18 U.S.C. § 1962(d)**
**SKAZKA, LLC ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Nimble Business Solutions, Inc., Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NIMBLE BUSINESS SOLUTIONS, INC. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Skazka, LLC, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVI**
**VIOLATION 18 U.S.C. § 1962(d)**
**NIMBLE BUSINESS SOLUTIONS, INC. ENTERPRISE**
**(Against Arthur Kostanian, Sergey Denevich, Gennadi Khodak, Skazka, LLC, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Darrin Kaloz, D.C., Yelena Shubina, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, Datta Endoscopic Back Surgery & Pain Center, LLC, Adjust For Life Chiropractic, P.C., and Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVII**
**COMMON LAW FRAUD**
**(Against Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Arthur Kostanian, Skazka, LLC, Sergey Denevich, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT XVIII**
**COMMON LAW FRAUD**
**(Against Garden State Neuro Stimulation, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

<u>**COUNT XIX**</u>
**COMMON LAW FRAUD**
**(Against Datta Endoscopic Back Surgery & Pain Center, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

<u>**COUNT XX**</u>
**COMMON LAW FRAUD**
**(Against Adjust For Life Chiropractic, P.C., Darrin Kaloz, D.C., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XXI
## COMMON LAW FRAUD
**(Against Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Yelena Shubina, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a)  AWARD Allstate its actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)  GRANT any other relief this Court deems just.

## COUNT XXII
## COMMON LAW FRAUD
**(Against Leading Edge Medical Diagnostic, P.C., Daniel Schlusselberg, M.D., Gennadi Khodak, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain Center, LLC)**

(a)  AWARD Allstate its actual damages in an amount to be determined at trial;

(b)  AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)  AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)  GRANT any other relief this Court deems just.

## COUNT XXIII
## UNJUST ENRICHMENT
**(Against Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)  GRANT any other relief this Court deems just.

## COUNT XXIV
### UNJUST ENRICHMENT
**(Against Garden State Neuro Stimulation, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)  GRANT any other relief this Court deems just.

## COUNT XXV
### UNJUST ENRICHMENT
**(Against Datta Endoscopic Back Surgery & Pain Center, LLC, Sukdeb Datta, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)  GRANT any other relief this Court deems just.

## COUNT XXVI
### UNJUST ENRICHMENT
**(Against Adjust For Life Chiropractic, P.C., Darrin Kaloz, D.C., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)  GRANT any other relief this Court deems just.

## COUNT XXVII
### UNJUST ENRICHMENT
**(Against Newburgh Primary Care, P.C. d/b/a Elite Orthopedics, Yelena Shubina, M.D., Arthur Kostanian, Sergey Denevich, Skazka, LLC, Gennadi Khodak, and Nimble Business Solutions, Inc.)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)  GRANT any other relief this Court deems just.

## COUNT XXVIII
### UNJUST ENRICHMENT
**(Against Leading Edge Medical Diagnostic, P.C., Daniel Schlusselberg, M.D., Gennadi Khodak, Gabriel Dassa, D.O., Sukdeb Datta, M.D., Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic, Garden State Neuro Stimulation, LLC, and Datta Endoscopic Back Surgery & Pain Center, LLC)**

(a)  AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Dassa Orthopedic Medical Services, P.C. d/b/a
### C\V Orthopedic)

(a) DECLARE that Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b) DECLARE that Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Dassa Orthopedic Medical Services, P.C. d/b/a C\V Orthopedic; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Garden State Neuro Stimulation, LLC)

(a) DECLARE that Garden State Neuro Stimulation, LLC is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b) DECLARE that Garden State Neuro Stimulation, LLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Garden State Neuro Stimulation, LLC; and

(d) GRANT all other relief this Court deems just and appropriate.

## <u>COUNT XXXI</u>
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Datta Endoscopic Back Surgery & Pain Center, LLC)

(a) DECLARE that Datta Endoscopic Back Surgery & Pain Center, LLC is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b) DECLARE that Datta Endoscopic Back Surgery & Pain Center, LLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Datta Endoscopic Back Surgery & Pain Center, LLC; and

(d) GRANT all other relief this Court deems just and appropriate.

## <u>COUNT XXXII</u>
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Adjust For Life Chiropractic, P.C.)

(a) DECLARE that Adjust For Life Chiropractic, P.C. is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b) DECLARE that Adjust For Life Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Adjust For Life Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Newburgh Primary Care, P.C. d/b/a Elite Orthopedics)

(a) DECLARE that Newburgh Primary Care, P.C. d/b/a Elite Orthopedics is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b) DECLARE that Newburgh Primary Care, P.C. d/b/a Elite Orthopedics's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Newburgh Primary Care, P.C. d/b/a Elite Orthopedics; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXXIV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Leading Edge Medical Diagnostic, P.C.)

(a) DECLARE that Leading Edge Medical Diagnostic, P.C. is operating in violation of New York Business Corporation Laws, New York Limited Liability Company Laws, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b) DECLARE that Leading Edge Medical Diagnostic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Leading Edge Medical Diagnostic, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## <u>JURY TRIAL DEMAND</u>

The plaintiffs demand a trial by jury on all claims.

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Hugh C.M. Brady*

_____
Hugh C.M. Brady (HB4724)
hbrady@ktmpc.com
350 Granite Street
Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company, and*
*Allstate Fire and Casualty Insurance Company*

Dated: August 24, 2023